**Ann B. HOPKINS, Plaintiff,**

v.

**PRICE WATERHOUSE, Defendant.**

**Civ. A. No. 84–3040.**

United States District Court, District of Columbia.

Sept. 20, 1985.

Stephen E. Tallent, Wayne A. Schrader, and Kathy Davidson Ireland, Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

Plaintiff was proposed for partnership in Price Waterhouse, a nationwide professional partnership, but was held for further consideration at the next annual partnership selection. The following year the partners in the unit where she worked decided not to propose her a second time. Plaintiff then resigned and filed this suit alleging sex discrimination in violation of Title VII. 42 U.S.C. § 2000e–2. The Court is asked to order that she be made a partner and to award back pay and other monetary relief. A bench trial lasting four and one-half days followed extensive discovery. After receiving proposed findings of fact, further briefs, and hearing full argument, the Court reaches the following findings of fact and conclusions of law.

### Background

Price Waterhouse is a partnership that specializes in providing auditing, tax and management consulting services primarily to private corporations and government agencies. At the time this action was filed, Price Waterhouse had 662 partners operating in 90 offices scattered across the nation. Its partners are certified public accountants and other specialists.

Despite its size and geographic dispersal, Price Waterhouse has consistently sought to maintain the traditional characteristics of a professional partnership both in its management and partnership selection practices. Partners manage the firm through a Senior Partner and Policy Board elected by all the partners. New partners are regularly selected from the ranks of the partnership's senior managers through an elaborate recommendation and review process that culminates in a partnership-wide vote in which the successful candidates are approved. There is no limitation on the number of partners who may be selected in any one year.

The admissions process takes place annually and begins when the partners of each local office may propose that one or more

Douglas B. Huron, James H. Heller, Washington, D.C., for plaintiff.

senior managers from their office be considered as partnership candidates. Partners in the local offices draft written recommendations based on a detailed consideration of the candidates' qualifications. These proposals are distributed to all of the firm's 662 partners and each partner is invited to submit evaluation forms on any candidate about whom the partner may have information. Partners who have significant and recent contact with the candidate submit "long-form" evaluations and partners who only have a limited basis upon which to evaluate the candidate submit "short form" evaluations. These forms ask the partners to rank the candidates relative to other recent partnership candidates in 48 different categories ranging from practice development and technical expertise to interpersonal skills and participation in civic activities. The numerical rankings in this exhaustive list of relevant, neutral criteria is supplemented by asking the partners to indicate whether they believe the candidate should be admitted to the partnership, denied partnership or held for further consideration and asking them to provide a short comment explaining their assessment.

The Admissions Committee reviews each candidate's personnel file and members of the Committee make visits to some local offices to interview partners who have commented in order to determine more precisely the basis for their views on the candidates. The Admissions Committee then prepares a summary of the evaluations and other information and makes its recommendations to the Policy Board. If the recommendation is to "hold" a candidate for reconsideration in a later year or a "no" recommendation denying admission, the Committee prepares a short written statement summarizing its reasons.

The Policy Board reviews the recommendations of the Admissions Committee and votes to include a candidate on the partnership ballot, to "hold" the candidate, or to deny partnership. While the Admissions Committee's recommendations focuses primarily on the qualifications of the individual candidate, the Policy Board may occasionally interject business considerations and decide to recommend a candidate because of the firm's need for a particular type of partner or a particular skill. The candidates recommended by the Policy Board are submitted to the entire partnership for election, and candidates who are not included on the ballot are informed of the Board's reasons for rejecting their candidacy. Candidates who have been held may be reproposed in later years and the review process begins again. Price Waterhouse made every document generated by this admissions process on candidates proposed for admission in 1982, 1983 and 1984 available to the plaintiff during the course of discovery in this case.

In 1982 the plaintiff was proposed for partnership by her office, the Office of Government Services (OGS), which specializes in designing and implementing consulting and management projects for government agencies. Plaintiff was the only woman among the 88 candidates for partnership that year. All of the partners in OGS at that time were men. Indeed, as of July, 1984 only seven of the 662 partners at Price Waterhouse were women.

Plaintiff had had a successful career as a senior manager in OGS and had played a significant role in developing business for the firm. She played a key role in Price Waterhouse's successful effort to win a multi-million dollar contract with the Department of State. Afterwards, she helped prepare a proposal and manage a project for a computerized system to handle the State Department's real property worldwide and successfully managed the preparation of a competitive proposal for a computer system to track loans of the Farmers' Home Administration. She had no difficulty dealing with clients and her clients appear to have been very pleased with her work. None of the other partnership candidates at Price Waterhouse that year had a comparable record in terms of successfully securing major contracts for the partnership. The partners in the OGS office fully endorsed her proposal for partnership. She was generally viewed as a highly competent project leader who worked long

hours, pushed vigorously to meet deadlines and demanded much from the multidisciplinary staffs with which she worked.

The comments submitted to the Admissions Committee, however, indicated that plaintiff had problems with her "interpersonal skills;" specifically, she had trouble in dealing with staff members. Eight of the thirty-two partners who submitted evaluations recommended that she be denied admission, three favored holding her for reconsideration, and eight indicated that they had insufficient basis for an opinion. Supporters and opponents of her candidacy indicated that she was sometimes overly aggressive, unduly harsh, difficult to work with and impatient with staff.[1] She sometimes used profanity and appeared to be insensitive to others. These negative comments and the significant number of "no" votes, most of which were by partners filing short forms because of their limited contact with the plaintiff, were determinative in the Admission Committee's decision to recommend "that she should be HELD at least a year to afford time to demonstrate that she has the personal and leadership qualities required of a partner."[2] After a full discussion the Policy Board adopted this recommendation.

After learning that her candidacy had been put on hold plaintiff, at the urging of the Senior Partner, underwent a Quality Control Review in order to improve her chances of making partner the next year. Several partners indicated that they planned to give the plaintiff opportunities to demonstrate her abilities and receive more exposure. However, these partners. never followed through on their plans and the favorable results of the Quality Control Review came too late because just four months after the Policy Board's recommendation the partners in OGS decided not to repropose the plaintiff for partnership. By that time, two partners in the OGS office strongly opposed her candidacy. Without strong support within that office, it was felt that her candidacy could not possibly be successful.

After the decision not to repropose, the plaintiff was advised that it was very unlikely that she would be admitted to partnership. Rather than waiting to try again or accepting an offer to remain as a senior manager, she resigned from Price Waterhouse in January, 1984. After pursuing the appropriate administrative remedies she brought this action.

## Discussion

From the outset Price Waterhouse has conceded that plaintiff was qualified to be considered for partnership and probably would have been admitted but for the complaints about her interpersonal skills. Consequently, there is no dispute that the plaintiff has presented a *prima facie* case under Title VII by showing that she was a qualified partnership candidate, she was rejected, and Price Waterhouse continues to seek partners with her qualifications. *See Cooper v. Federal Reserve Bank*, 467 U.S. 867, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 & n. 6, 101 S.Ct. 1089, 1094 & n. 6, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The only dispute between the parties is whether Price Waterhouse's concerns about the plaintiff's interpersonal skills present a legitimate, nondiscriminatory reason to deny partnership or constitute a pretext to disguise sex discrimination.

Plaintiff advanced three arguments for maintaining that the decision was discriminatory: (1) the criticisms of plaintiff's interpersonal skills were fabricated; (2) even if the firm believed her interpersonal skills were deficient, Price Waterhouse has routinely admitted male candidates with interpersonal skills problems if they had strong qualifications in other areas and would have admitted her if she had not been a woman; (3) the criticisms of the plaintiff's interpersonal skills were a product of sexu-

---

**1.** Plf.Ex. 21.

**2.** Plf.Ex. No. 19; Tr. 267–68.

al stereotyping by male partners and the firm's partnership selection process improperly gave full weight to these discriminatory evaluations. Price Waterhouse denies these allegations and claims that plaintiff was properly denied partnership because the firm, for legitimate business reasons, seeks to avoid having abrasive partners who might jeopardize morale and be incapable of successfully supervising staff as they move among different locations in response to work demands. Although plaintiff's arguments are closely interrelated, it is necessary to examine them separately.

### 1. Fabrication of Complaints About Interpersonal Skills.

■ The interpersonal skills of prospective partners was properly an important part of Price Waterhouse's written partnership evaluation criteria. Inability to get along with staff or peers is a legitimate, nondiscriminatory reason for refusing to admit a candidate to partnership. *Cf. Bellissimo v. Westinghouse Electric Corp.,* 764 F.2d 175, 37 Fair Empl.Prac.Cas. (BNA) 1862 (3d Cir.1985); *Johnson v. Allyn & Bacon, Inc.,* 731 F.2d 64, 73 (1st Cir.1984), *cert. denied,* ⸺ U.S. ⸺, 105 S.Ct. 433, 83 L.Ed.2d 359 (1984); *Burrus v. United Telephone of Kansas,* 683 F.2d 339, 342–43 (10th Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

■ It is clear that the complaints about the plaintiff's interpersonal skills were not fabricated as a pretext for discrimination. Even the plaintiff admitted that she is a "hard-driving" manager who pushes her staff and occasionally uses profanity.[3] Contemporaneous records of counseling sessions and evaluations conducted well before the plaintiff was proposed for partnership indicate that partners found her too assertive, overly critical of others, impatient with her staff, and counselled her to soften her image.[4] At the time, plaintiff

indicated that she agreed with many of these criticisms. Even partners who strongly supported her partnership candidacy acknowledged these deficiencies, although in more muted tones, when emphasizing the high quality of her work and her value to the firm. Staff members who testified on the plaintiff's behalf indicated that she was an effective manager but her hard-driving style might be regarded as "controversial" and it required "diplomacy, patience and guts" to work with her.[5] Plaintiff's conduct provided ample justification for the complaints that formed the basis of the Policy Board's decision.

■ Plaintiff also alleges that the two OGS partners who blocked reproposing her after the Policy Board held her candidacy for reconsideration falsified their reasons to hide their discriminatory motives. There is not sufficient proof to support this allegation. One partner recommended that she be put on hold when she was first proposed and apparently opposed reproposal because he found her disagreeable to work with and had reservations about her technical skills and dedication to the firm. Although there is some suggestion that this partner may have held a personal grudge against the plaintiff, there is no proof that his position was animated by animosity toward her sex.

The second partner supported the plaintiff when she was first proposed, but changed his position after receiving additional criticism of her management style from staff members, having several conversations with the plaintiff, and reflecting on his previous experience with her work. His decision to oppose the plaintiff's candidacy put him in the uncomfortable position of being in direct conflict with the head partner in the office, who was one of the plaintiff's biggest boosters. Although the plaintiff disputes his version of the events that led him to change his vote, the Court found him to be a credible witness and accepts his account of these events. Plain-

---

3. Tr. 44, 52.

4. Def.Ex. No. 10, 11, 12, 13, 14, 17, 24, 25.

5. Tr. 423, 434.

tiff has failed to satisfy her burden of proving that the explanations given by these two partners were pretextual.

As a result, plaintiff has failed to show that the decision of the OGS partners not to repropose her was discriminatory. While offers from several partners to arrange assignments which might have improved her chances for partnership never materialized and no one made any effort to check on the plaintiff's current relationship with staff members after she was placed on hold, the evidence before the Court indicates that this was due to the timing of the partnership evaluation process rather than any discriminatory motives. Only a few months separated the announcement that plaintiff had been placed on hold and the vote not to repropose her so the firm had little opportunity to change plaintiff's assignment or do a thorough investigation into her subsequent relationships with staff. The decision not to repropose was due to the unexpected position taken by the two partners discussed above and plaintiff has not proven that their actions were discriminatory.

### 2. Balancing Interpersonal Skills Against Other Qualifications.

Plaintiff alleges that even if there were problems with her interpersonal skills she was so highly qualified in every other respect that the firm would have made her a partner if it had not discriminated against her because of her sex. She claims that the Policy Board invariably admits men who have interpersonal skills problems and comparing her "superb" record with that of these men shows that she is a victim of classic disparate treatment. Price Waterhouse does not concede that interpersonal skills were the plaintiff's sole deficiency, but it admits that they were the principle and determinative reason for the firm's

decision. Nonetheless, Price Waterhouse claims that the male candidates that the plaintiff points to are not comparable and do not indicate disparate treatment.

■ Fortunately the Court does not have to engage in the difficult task of second-guessing the Policy Board's balancing of professional skills of candidates from different years in order to resolve this allegation. The contemporaneous records generated by the partnership selection procedure demonstrate that Price Waterhouse had legitimate, nondiscriminatory reasons for distinguishing between the plaintiff and the male partners with whom she compares herself.

From past partnership admissions records the plaintiff has identified two male candidates who were criticized for their interpersonal skills because they were perceived as being aggressive, overbearing, abrasive or crude, but were recommended by the Policy Board and elected partner. Price Waterhouse points out that in both cases the Policy Board expressed substantial reservations about the candidates' interpersonal skills but ultimately made a "business decision" to admit the candidates because they had skills which the firm had a specific, special need and the firm feared that their talents might be lost if they were put on hold. In one case the Policy Board rejected a "hold" recommendation by the Admissions Committee because of business considerations. In addition, these candidates received fewer evaluations from partners recommending that they be denied partnership and the negative comments on these candidates were less intense than those directed at the plaintiff.[6]

The significance of "no" votes and negative comments warrants some further comment. In the course of this trial, Price Waterhouse has been very forthcoming in

---

6. Def.Ex. Nos. 73, 83, 84; Plf.Ex. No. 20. In post-trial briefing, the plaintiff sought to raise two additional examples. The evidence before the Court on these candidates is fragmentary, at best, consisting of comments taken out of context, statistical summaries of their evaluation forms and brief notes. From this limited evidence it appears that these candidates also evoked fewer and less intense negative comments than the plaintiff. The Court finds that the plaintiff has not provided sufficient proof to demonstrate disparate treatment based on these candidates.

providing information on its partnership selection process. The evidence as a whole indicates that over the years the firm has consistently placed a high premium on candidates' ability to deal with subordinates and peers on an interpersonal basis and to promote cordial relations within a firm which is necessarily dependent on team effort. Not only are candidates regularly held because of concerns about their interpersonal skills—the Policy Board takes any evaluations recommending denial of partnership or a negative reaction on this basis very seriously. Despite the fact that the negative comments of short form evaluators are often in sharp contrast to the glowing reports of partners who have had extensive contact with the candidate, such comments are treated as serious reservations and given great weight. "No" votes, even from short form commentors who may only have had very limited contact with the candidate, often result in a "no" or "hold" decision.

Thus, while plaintiff argues that her accomplishments in generating business, management and client satisfaction were so far above average that she would have been admitted despite any interpersonal skills problems if Price Waterhouse had honestly balanced all her qualifications, Price Waterhouse responds by pointing out that she received very few "yes" votes and more "no" votes than all but two of the 88 candidates that year. These no votes and negative comments, largely from partners outside OGS, effectively placed the plaintiff toward the bottom of the candidate pool. Regardless of its wisdom, the firm's practice of giving "no" votes great weight treated male and female candidates in the same way. "The issue in a case of alleged failure to hire or promote is not the objective superiority or inferiority of the plaintiff's qualifications, but rather whether the defendant's selection criteria—be they wise or foolish—are *nondiscriminatory.*" *Mitchell v. Baldrige,* 759 F.2d 80, 85 n. 3 (D.C.Cir.1985). The Court finds that the firm's emphasis on negative comments did not, by itself, result in any discriminatory disparate treatment.

Plaintiff tried to reinforce her claim of disparate treatment with a number of statistics that proved wholly inconclusive. Plaintiff attempted to show that the small number of women partners at Price Waterhouse indicates discrimination but her proof lacked sufficient data on the number of qualified women available for partnership and failed to take into account that the present pool of partners have been selected over a long span of years during which the pool of available qualified women has changed. Women have only recently entered the accounting and related fields in large numbers and there is evidence that many potential women partners were hired away from Price Waterhouse by clients and rival accounting firms.

Although women partnership candidates have been elected to partnership at a slightly lower rate than men (60% versus 68%), the difference is not statistically significant. The other statistical studies presented by plaintiff only bear an indirect relationship to Price Waterhouse's practice in partnership selection, and when corrected to examine the appropriate comparisons, lack statistical significance. No conclusion can be drawn from this fragile data.

### 3. Stereotyping and the Partnership Selection Process.

Plaintiff's final argument begins with the allegation that the male partners who criticized her interpersonal skills applied a double standard. She claims that she was not evaluated as a manager, but as a woman manager, based on a sexual stereotype that prompts males to regard assertive behavior in women as being more offensive and intolerable than comparable behavior in men because some men do not regard it as appropriate "feminine" behavior.

Plaintiff claims that this type of sexual stereotyping is reflected in comments about her aggressiveness and profanity that indicate she was being evaluated as a woman and not simply as a partnership candidate. One commentor said "she may have overcompensated for being a wom-

an." Another suggested that she needed to take a "course at charm school." Supporters indicated that her critics judged her harshly due to her sex. One acknowledged "Ann has a clearly different personality," but "[m]any male partners are worse than Ann (language and tough personality)," and people were only focusing on her profanity "because its a lady using foul language." Another conceded that she initially came across as "macho" but said, "if you get around the personality thing she's at the top of the list or way above average." Another defended her by saying, "she had matured from a tough-talking, somewhat masculine hard-nosed mgr. to an authoritative, formidable, but much more appealing lady partner candidate."[7] When plaintiff consulted with the head partner at OGS, who was her strongest supporter and responsible for telling her what problems the Policy Board had identified with her candidacy, she was advised to walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.[8]

Some comments on other women partnership candidates in prior years support the inference that the partnership evaluation process at Price Waterhouse was affected by sexual stereotyping. Candidates were viewed favorably if partners believed they maintained their feminity while becoming effective professional managers. To be identified as a "women's liber" was regarded as negative comment. Nothing was done to discourage sexually biased evaluations. One partner repeatedly commented that he could not consider any woman seriously as a partnership candidate and believed that women were not even capable of functioning as senior managers—yet the firm took no action to discourage his com-

ments and recorded his vote in the overall summary of the evaluations. Besides the plaintiff, the Admissions Committee rejected at least two other women candidates because partners believed that they were curt, brusque and abrasive, acted like " 'Ma Barker' " or tried to be " 'one of the boys'." Comments suggesting that sex stereotypes may have influenced the partners' evaluations of interpersonal skills were not frequent, but they appear as part of the regular fodder of the partnership evaluations.[9]

Plaintiff presented a well qualified expert, Dr. Susan Fiske, who has done extensive research and study in the field of stereotyping. Dr. Fiske examined the partners comments about the plaintiff and other partnership candidates and gave opinions as to the possible presence of sex stereotyping. Dr. Fiske did not purport to be able to determine whether or not any particular reaction was determined by the operation of sex stereotypes. However, she did identify comments that she believed were influenced by sex stereotypes. Dr. Fiske stated that in her opinion unfavorable comments by male partners, slanted in a negative direction by operation of male stereotyping, were a major factor in the firm's evaluation of the plaintiff. But she could not pinpoint the degree to which stereotyping had influenced the selection process.

That deep within males and females there exist sexually based reactions to the personal characteristics of one of the opposite sex surely comes as no surprise. It is well documented that men evaluating women in managerial occupations sometimes apply stereotypes which discriminate against women.[10] Indeed, the subtle and unconscious discrimination created by sex

---

7. Plf.Ex. No. 21; Def.Ex. No. 30, 31; Tr. 321.

8. Tr. 102, 316.

9. Def.Ex. No. 63.

10. *See, e.g.* Ruble, Cohen and Ruble, *Sex Stereotypes: Occupational Barriers for Women,* 27 Amer.Behav.Sc. 339 (1984) (surveying literature); R.M. KANTER, MEN AND WOMEN OF THE CORPORATION 206–42 (1977) (reporting

results of study); Rosen and Jerdee, *Perceived Sex Differences in Managerial Relevant Characteristics,* 4 Sex Roles 837 (1978) (same); Rosen and Jerdee, *Influence of Sex Role Stereotypes on Personnel Decisions,* 59 J.Appl.Psych. 9 (1974) (same); Schein, *The Relationship Between Sex Role Stereotypes and Requisite Management Characteristics,* 57 J.App.Psych. 95 (1973) (same).

stereotyping appears to be a major impediment to Title VII's goal of ensuring equal employment opportunities.[11] Dr. Fiske testified that situations, like that at Price Waterhouse, in which men evaluate women based on limited contact with the individual in a traditionally male profession and a male working environment foster stereotyping. One common form of stereotyping is that women engaged in assertive behavior are judged more critically because aggressive conduct is viewed as a masculine characteristic.[12]

■ Establishing a claim of disparate treatment based on subjective evaluations requires proof of discriminatory motive or purpose. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The Court finds that while stereotyping played an undefined role in blocking plaintiff's admission to the partnership in this instance, it was unconscious on the part of the partners who submitted comments. The comments of the individual partners and the expert evidence of Dr. Fiske do not prove an intentional discriminatory motive or purpose. A far more subtle process is involved when one who is in a distinct minority may be viewed differently by the majority because the individual deviates from an artificial standardized profile. Even in examining the comments months later at trial, it is impossible to label any particular negative reaction as being motivated by intentional sex stereotyping. Business women who earn a place at the highest ranks of their profession by combining ability with a strong persistent effort to succeed frequently sense antagonism from some male colleagues whose contact with the working female as an equal has been limited. However, considering the infinite variety of work conditions; differences in experience, education and perceptions among individuals in working encounters; as well as the fact that the interactions of personalities of either sex are as complex and inscrutable and as infinite as combinations of genes will produce, it is impossible to accept the view that Congress intended to have courts police every instance where subjective judgment may be tainted by unarticulated, unconscious Congress intended to have courts police every instance where subjective judgment may be tainted by unarticulated, unconscious assumptions related to sex.

But plaintiff takes her argument one step further and stresses that the Price Waterhouse partnership evaluation system permitted negative comments tainted by stereotyping to defeat her candidacy, despite clear indications that the evaluations were tainted by discriminatory stereotyping. All the evaluators were men. The Policy Board gave great weight to the negative views of individuals who had very little contact with the plaintiff. Several of the negative comments allude to the plaintiff's sex and many might be attributed to sex stereotyping. Despite the fact that the comments on women candidates often suggested that the male evaluators may have been influenced by a sex bias, the Policy Board never addressed the problem. The firm never took any steps in its partnership policy statement or in the evaluation forms submitted to partners to articulate a policy against discrimination or to discourage sexual bias.[13] The Admissions Committee nev-

---

**11.** *See* Taub, *Keeping Women in Their Place: Stereotyping Per Se As A Form of Employment Discrimination,* 21 B.C.L.Rev. 345, 349–61 (1980).

**12.** *See, e.g.* Wiley and Eskilson, *Coping in the Corporation, Sex Role Constraints,* 12 J.App.Soc. Psych. 1, 8 (1982); Prather, *Why Can't Women Be More Like Men: A Summary of the Sociopsychological Factors Hindering Women's Advancement in the Professions,* 15 Am.Beh.Sc. 172 (1971).

**13.** Price Waterhouse submitted evidence to show it had promulgated a general policy of equal employment opportunities in employment for all minorities. Def.Ex. Nos. 88, 89. However, the exhibits before the Court only reflect a policy statement issued sometime in 1983. More importantly, the statement is directed generally at staff employment. It is not clear whether it applies to the partnership selection process at all and it does not address any special concerns with discrimination against women in an overwhelmingly male partnership.

er attempted to investigate whether any of the negative comments concerning the plaintiff were based on a discriminatory double standard.[14]

Whenever a promotion system relies on highly subjective evaluations of candidates by individuals or panels dominated by members of a different sex, there is ground for concern that such "high level subjectivity subjects the ultimate promotion decision to the intolerable occurrence of conscious or unconscious prejudice." *Robinson v. Union Carbide Corp.*, 538 F.2d 652, 662 (5th Cir.1976), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977). Such procedures "must be closely scrutinized because of their capacity for masking unlawful bias." *Davis v. Califano*, 613 F.2d 957, 965 (D.C.Cir.1979). This scrutiny comprehends examination of evaluation procedures that permit or give effect to sexual stereotyping. Differential treatment on account of sex, even if it is not obviously based on a characteristic of sex, violates Title VII. *McKinney v. Dole*, 765 F.2d 1129, 1138–39 (D.C.Cir.1985). An employer who treats a woman with an assertive personality in a different manner than if she had been a man is guilty of sex discrimination. *See Craik v. Minnesota State University Board*, 731 F.2d 465, 481–84 (8th Cir.1984); *Skelton v. Balzano*, 424 F.Supp. 1231, 1235 (D.D.C.1976). A female cannot be excluded from a partnership dominated by males if a sexual bias plays a part in the decision and the employer is aware that such bias played a part in the exclusion decision.

Although the stereotyping by individual partners may have been unconscious on their part, the maintenance of a system that gave weight to such biased criticisms was a conscious act of the partnership as a whole. There is no direct evidence of any determined purpose to maliciously discriminate against women but plaintiff appears to have been a victim of "omissive and subtle" discrimination created by a system that made evaluations based on "outmoded attitudes" determinative. *Marimont v.*

*Califano,* 464 F.Supp. 1220, 1226 & n. 15 (D.D.C.1979). As noted above, the firm accorded substantial weight to negative comments and recommendations, even if they came from partners who had limited contact with a candidate. The evidence indicates that Price Waterhouse should have been aware that women being evaluated by male partners might well be victims of discriminatory stereotypes. Yet the firm made no efforts to make partners sensitive to the dangers, to discourage comments tainted by sexism, or to investigate comments to determine whether they were influenced by stereotypes.

The Court is aware that this case involves applying Title VII to a professional partnership. Partnership consideration was clearly a privilege of plaintiff's employment covered by Title VII. *Hishon v. King and Spaulding,* 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Title VII does not bar a partnership from considering subjective evaluations of interpersonal skills as significant criteria in the partnership selection process. Subjective evaluations in high-level, professional jobs have received particular deference in Title VII cases. *See Zahorik v. Cornell University,* 729 F.2d 85, 93 (2d Cir.1984); *Harris v. Group Health Insurance,* 662 F.2d 869, 873 (D.C.Cir.1981); Bartholet, *Application of Title VII to Jobs in High Places,* 95 Harv.L.Rev. 945, 973–78 (1982); Waintroob, *The Developing Law of Equal Employment Opportunity at the White Collar and Professional Level,* 21 Wm. & Mary.L. Rev. 45, 48–62 (1979). However, while partnerships must be given freedom to evaluate the qualifications of employees who seek to become partners, they are not free to inject stereotyped assumptions about women into the selection process. Neither a partnership nor any other employer can remain indifferent to indications that its evaluation system is subject to sex bias, as Price Waterhouse did in plaintiff's case. Price Waterhouse's failure to take the steps necessary to alert partners to the

**14.** Def.Ex. No. 23; Tr. 280–81; Connor Dep. at 103.

possibility that their judgments may be biased, to discourage stereotyping, and to investigate and discard, where appropriate, comments that suggest a double standard constitutes a violation of Title VII in this instance.[15]

Price Waterhouse had every reason and legal right to come down hard on abrasive conduct in men or women seeking partnership. But " '[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the *entire spectrum* of disparate treatment of men and women resulting from sex stereotypes.' " *County of Washington v. Gunther*, 452 U.S. 161, 180, 101 S.Ct. 2242, 2253, 68 L.Ed.2d 751 (1981), *quoting Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 1375 n. 13, 55 L.Ed.2d 657 (1978). This is not a case where "standards were shaped only by neutral professional and technical considerations and not by any stereotypical notions of female roles and images." *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 38 Fair Empl.Prac.Cas. (BNA) 404, 412 (8th Cir.1985). Discriminatory stereotyping of females was permitted to play a part. Comments influenced by sex stereotypes were made by partners; the firm's evaluation process gave substantial weight to these comments; and the partnership failed to address the conspicuous problem of stereotyping in partnership evaluations. While these three factors might have been innocent alone, they combined to produce discrimination in the case of this plaintiff. The Court finds that the Policy Board's decision not to admit the plaintiff to partnership was tainted by discriminatory evaluations that were the direct result of its failure to address the evident problem of sexual stereotyping in partners' evaluations.[16]

**Remedy**

 Because plaintiff had considerable problems dealing with staff and peers, the Court cannot say that she would have been elected to partnership if the Policy Board's decision had not been tainted by sexually biased evaluations. Even supporters of the plaintiff viewed her style as somewhat offensive and detrimental to her effectiveness as a manager. However, once a plaintiff proves that sex discrimination played a role in an employment decision, the plaintiff is entitled to relief unless the employer has demonstrated by clear and convincing evidence that the decision would have been the same absent discrimination. *Williams v. Boorstin*, 663 F.2d 109, 117 (D.C.Cir.1980); *Day v. Mathews*, 530 F.2d 1083, 1085–86 (D.C.Cir.1976). Price Waterhouse has not done so. Where sex discrimination is present, even if a promotion decision is a mixture of legitimate and discriminatory considerations, uncertainties must be resolved against the employer so that the remedial purposes of Title VII will not be thwarted by saddling an individual subject to discrimination with an impossible burden of proof.

15. Common sense is confirmed by the literature on the problem of sex stereotyping which suggests that making evaluators aware of the risk of biased evaluations and inquiring as to whether generalizations are supported by concrete incidents can be effective in eliminating or minimizing stereotyping. *See* Taub, *supra* note 7, at 3600, 395–97; Wiley and Eskilson, *supra* note 8, at 9.

16. There is currently a split among the circuits as to whether a subjective evaluation process may be challenged based on disparate impact and disparate treatment theories or may only be challenged on disparate treatment theory. *Compare Pouncy v. Prudential Insurance Company of America*, 668 F.2d 795, 799–801 (5th Cir.1982) (discriminatory impact model inappropriate for challenging subjective evaluation procedures) *with Griffin v. Carlin*, 755 F.2d 1516, 1522–25 (11th Cir.1985) (both models may be used to challenge subjective evaluations); *Segar v. Smith*, 738 F.2d 1249, 1288 n. 34 (D.C.Cir. 1984) (disparate impact applied to evaluation process with some subjective elements). We need not become involved in this dispute. Plaintiff cannot show the substantial statistical disparity ordinarily required to show that a subjective evaluation process produces a discriminatory disparate impact. *See Yartzoff v. State of Oregon*, 745 F.2d 557 (9th Cir.1984). This decision is based on disparate treatment where the employer maintained a subjective evaluation process which, based on the proof presented in the comments on the plaintiff, resulted in plaintiff's evaluation being tainted by a discriminatory bias.

However, plaintiff must carry the burden of proof on another issue. She has the burden of proving that she was constructively discharged. If the plaintiff resigned voluntarily, and not because Price Waterhouse made working conditions intolerable and drove her to quit, she is not entitled to an order that she be made a partner. *Clark v. Marsh*, 665 F.2d 1168, 1172–73 (D.C.Cir.1981). The fact that discrimination has occurred does not, by itself, provide the "aggravating factors" required to prove a constructive discharge. *Id.* at 173–74. Plaintiff has not shown any history of discrimination, humiliation or other aggravating factors that would have compelled her to resign. She dropped her allegations of harassment and retaliation before trial. Aside from Price Waterhouse's denial of partnership, plaintiff's experience at the firm appears to have been quite normal and amicable. The one incident in which a project managed by the plaintiff was unfavorably evaluated appears to have involved a disagreement over the appropriate technical standards rather than an improper effort to pressure plaintiff to resign. Price Waterhouse offered to retain her as an employee and some partners even encouraged her to take this option rather than resign when it appeared unlikely that she would become a partner.[17] Being denied partnership was undoubtedly a professional disappointment and it may have been professionally advantageous for plaintiff to leave the firm when it was unlikely she would not obtain her ultimate goal. Disappointments do not constitute a constructive discharge, however. *See Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 65–66 (5th Cir.1980); *Sparrow v. Piedmont Health Systems Agency, Inc.*, 593 F.Supp. 1107, 1117–18 (M.D.N.C.1984). Recognizing that in partnerships, as in other employment contexts, "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of exiting employment relationships." 617 F.2d at 66, plaintiff's failure to show a constructive discharge requires the Court to deny plaintiffs request for an order directing Price Waterhouse to make her a partner.

Because plaintiff has failed to prove a constructive discharge, she is not entitled to any monetary relief for the period subsequent to her resignation. *Clark v. Marsh*, 665 F.2d at 1172. Nevertheless, plaintiff has satisifed her burden of proving discrimination under Title VII and established the predicate for an award of backpay from the date she would have been elected partner, July 1, 1983, until her voluntary resignation on January 17, 1984. Backpay for these few months, limited to the difference between plaintiff's compensation as a senior manager during that period and what her compensation would have been if elected to partnership, might have been appropriate if proof had been presented. However, no evidence has been presented on what compensation plaintiff would have received if she had been elected partner. The parties have represented that, without the knowledge or consent of the Court, they agreed to defer resolving the amount of backpay until the issue of liability was resolved. But the parties do not have the authority to structure a trial for their own convenience. Issues can only be separated for a separate trial by order of the Court. Fed.R.Civ.P. 42(b). No such order was ever requested or granted in this case. A party who makes an "unauthorized determination not to go forward on issues that were properly in the case does so at his own peril." *U.S. Industries Inc. v. Blake Construction Co., Inc.*, 765 F.2d 195, 209–10 (D.C.Cir.1985). Under the circumstances the Court can do no more than recognize plaintiff as the prevailing party on the issue of liability, grant judgment in favor of the plaintiff, and award attorneys fees. No other equitable relief is appropriate on this record.

An appropriate order is entered contemporanenous with the filing of this memorandum.

---

**17.** Tr. 112.

## ORDER

It appearing for reasons set forth in a memorandum filed this day that plaintiff has prevailed on the merits of her claim that denial of partnership in her specific situation was caused, in part, by defendant's failure to protect against the presence of sex discrimination in evaluations of her qualifications for partnership, but that plaintiff has failed to establish any basis for granting equitable relief in the form of backpay or other relief, it is hereby

ORDERED, that the complaint shall be and hereby is dismissed; and it is further

ORDERED, that plaintiff shall be and hereby is awarded her reasonable attorneys fees plus costs to be set by the clerk; and it is further

ORDERED, that the parties shall attempt to agree on an amount to compensate for such reasonable attorney fees and advise the Court in writing on or before September 30, 1985, whether further proceedings to establish the fee award will be necessary.