Ann B. HOPKINS, Appellant,

v.

PRICE WATERHOUSE.

Ann B. HOPKINS

v.

PRICE WATERHOUSE, Appellant.

Nos. 85–6052, 85–6097.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1986.

Decided Aug. 4, 1987.

460

James H. Heller, with whom Douglas B. Huron, Washington, D.C., was on brief, for appellant in No. 85–6052 and cross-appellee in No. 85–6097.

Stephen R. Tallent, with whom Wayne A. Schrader and Kathy Davidson Ireland, Washington, D.C., were on brief, for appellee in No. 85–6052 and cross-appellant in No. 85–6097.

Before EDWARDS and WILLIAMS, Circuit Judges, and JOYCE HENS GREEN,* District Judge.

Opinion for the Court filed by District Judge JOYCE HENS GREEN.

Dissenting opinion filed by Circuit Judge WILLIAMS.

JOYCE HENS GREEN, District Judge:

In *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), the Supreme Court ruled for the first time that decisions concerning advancement to partnership are governed by Title VII, 42 U.S.C. § 2000e, et seq., and must therefore be made without regard to race, sex, religion, or national origin. This case, the first challenge to a partnership denial to reach us since *Hishon*, presents several novel and important questions that arise from the application of federal employment discrimination law to collegial bodies such as partnerships. Following a five-day trial, the District Court found that Price Waterhouse, one of the nation's largest accounting firms, had discriminated against plaintiff Ann Hopkins by permitting stereotypical attitudes towards women to play a significant, though unquantifiable, role in its decision not to invite her to become a partner. The court concluded that Hopkins was entitled to an award of backpay from the date she should have been elected partner until the date of her resignation seven months later, but ruled that, notwithstanding the parties' agreement to defer consideration of damages until after a decision on the issue of liability, Hopkins' failure to present any evidence as to the amount of compensation she was due barred her from recovering all damages save attorneys' fees. The trial court further found that Hopkins had failed to establish that she had been constructively discharged following Price Waterhouse's failure to make her a partner, and thus declined to award her backpay for the period subsequent to her resignation or to order Price Waterhouse to invite her to become a partner. The parties cross-appealed.[1] For the reasons set forth

below, we affirm the District Court's determination of liability, but reverse its judgment as to the appropriate relief and remand for further proceedings on this issue.

I.

A. *Background*

Price Waterhouse is a professional partnership specializing in auditing, tax, and management consulting services, primarily for private corporations and government agencies. The firm is known colloquially as one of the nation's "big eight" accounting firms; at the time this suit commenced, it had 662 partners working in 90 offices across the country. Price Waterhouse is managed by a Senior Partner and Policy Board elected by all the partners. New partners are regularly drawn from the ranks of the firm's senior managers through a formal nomination and review process that culminates in a partnership-wide vote. There are no formal limits on the number of persons who may be made partners in any one year. *Hopkins v. Price Waterhouse*, 618 F.Supp. 1109, 1111 (D.D.C.1985).

Plaintiff joined Price Waterhouse as a manager in August 1978 and began working in its Office of Government Services (OGS) in Washington, D.C. She specialized in preparing, securing, and managing contracts for large-scale computer-based systems designed specifically for government agencies. Plaintiff had previously worked at Touche Ross, another large accounting firm where her husband was also employed, but left because that firm's rules prohibited both husband and wife from being considered for partnership. Shortly after her departure, plaintiff's husband became a partner at Touche Ross. In order to hire her, Price Waterhouse waived one of its own rules that barred employment of anyone whose spouse was a partner in a competing firm. In 1981, however, the firm advised plaintiff that, because of her

---

* Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

1. For the sake of convenience, the court will refer to the parties as plaintiff and defendant, rather than appellant, cross-appellee, and appellee, cross-appellant.

husband's position at Touche Ross, she would not be eligible for partnership at Price Waterhouse. She threatened to resign and the matter was resolved only because Hopkins' husband left Touche Ross to set up his own consulting firm. Plaintiff was nominated for partnership a year later, in August 1982.

There is no dispute that Hopkins was qualified for partnership consideration. She was exceptionally successful in garnering business for the firm, winning contract awards with the Department of State and the Farmers Home Administration worth an estimated $34 to $44 million to Price Waterhouse. The firm's Senior Partner, Joseph Connor, characterized one of these contracts—a world-wide computerized system capable of handling all State Department financial transactions—as a "leading credential" that enabled the firm to win similar business from other federal agencies. The District Court expressly found that none of the other candidates considered for partnership in 1983 had generated more business for Price Waterhouse than plaintiff. 618 F.Supp. at 1112. In addition, she billed more hours than any of the other candidates under consideration.

The partners in OGS formally initiated the admission process for plaintiff by nominating her for partnership in August 1982. In support of her candidacy OGS submitted a flattering appraisal of her work, highlighting her "outstanding performance" in connection with the State Department project, and strongly urging her admission to the partnership. The appraisal stated in part:

> In her five years with the firm, she has demonstrated conclusively that she has the capacity and capability to contribute significantly to the growth and profitability of the firm. Her strong character, independence and integrity are well recognized by her clients and peers. Ms. Hopkins has outstanding oral and written communication skills. She has a good business sense, and ability to grasp and handle quickly the most complex issues, and strong leadership qualities.

Plaintiff's Exhibit ("Pl.Ex.") 15.

After a local office such as OGS nominates one of its senior managers for part-

nership, Price Waterhouse circulates the nominee's name and the accompanying appraisal of his or her work to all partners, who are invited to comment on the candidate. Those partners who have worked closely or extensively with a candidate submit "long-form" evaluations, while those whose contact has been more limited submit "short-forms." Partners are asked to rank individual nominees against all other candidates in 48 categories; to indicate whether the individual should be admitted, rejected, or placed on hold; and to provide written comments explaining their recommendations. The Admissions Committee, an arm of the firm's Policy Board, reviews each candidate's personnel file and occasionally interviews individual partners who have commented on a given candidate. The Committee then prepares a summary of the evaluations and makes its own recommendations to the Policy Board, providing a short written statement explaining any recommendation to hold or reject a candidate. The Policy Board in turn votes on whether the candidate should be included on the partnership ballot, held for reconsideration, or rejected. The Board can override the recommendations of the Admissions Committee and evaluates candidates not only on the basis of their individual merit, but also in terms of the firm's business needs. Those candidates who receive the Board's approval are placed on the ballot for a partnership-wide election; those who are not included are informed of the Board's reasons for rejecting or postponing their candidacies.

Plaintiff was the only woman among the 88 candidates nominated for partnership in August 1982. Of these, 47 were invited to join the partnership, 21 were rejected outright, and the remaining 20—including plaintiff—were placed on hold. Seventeen of the 19 men placed on hold were renominated the following year (the other two had been placed on two-year holds), and of these, 15 were ultimately admitted. OGS, however, did not renominate plaintiff. Of the thirty-two partners who submitted evaluations and comments on her candidacy,

fully a fourth opposed her admission; another three partners recommended that she be held for reconsideration; and eight others stated that they lacked a sufficient basis upon which to form an opinion. 618 F.Supp. at 1113. Many of the comments from evaluating partners centered on Hopkins' apparent difficulties with staff, and both supporters and opponents of her candidacy characterized her as sometimes overly aggressive, unduly harsh, impatient with staff, and very demanding.

A number of these complaints about plaintiff's lack of "interpersonal skills" were couched in terms of her sex. One critic suggested that Hopkins needed to take a "course at charm school." Pl.Ex. 21. A supporter sought to excuse her behavior by speculating that "she may have overcompensated for being a woman." Defendant's Exhibit ("Def.Ex.") 31. A member of the Admissions Committee investigated a reference in Hopkins' personnel file about her use of profanity and testified that "several ... partners" regarded her language as "one of the negatives." Transcript of Trial ("Tr.") 321. One supporter felt compelled to defend her on this subject, arguing that "[m]any male partners are worse than Ann (language and tough personality)"; this partner believed that the concerns over her profanity arose only "because she is a lady using foul language." *Id.* Another supporter opined that Hopkins initially came across as "macho," but concluded that "if you get around the personality thing she's at the top of the list or way above average." Still another supporter wrote that plaintiff "had matured from a tough-talking, somewhat masculine hard-nosed mgr. to an authoritative, formidable, but much more appealing lady partner candidate." Pl.Ex. 21.

Due to the large number of comments concerning her interpersonal skills, the Admissions Committee recommended that Hopkins' candidacy be held for at least a year. The Policy Board concurred, noting that although plaintiff had "a lot of talent," she needed "social grace." Pl.Ex. 20. Shortly thereafter, plaintiff met with the firm's Senior Partner, Joseph Connor, to discuss the Board's decision, and he urged

her to undertake a Quality Control Review, which would allow her to work with more partners, demonstrate her skills, and allay concerns about her ability to deal with staff. Prior to that meeting, Thomas Beyer, the head partner at OGS and perhaps Hopkins' most fervent supporter, discussed with her problems the Board had identified with her candidacy and the steps she might take to enhance her partnership prospects. Beyer advised her "to walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 618 F.Supp. at 1117.

Four months after she embarked on her Quality Control Review, however, the partners at OGS decided not to propose Hopkins for partnership. During the year following her initial nomination, Hopkins lost the support of two of these partners, who had come to strongly oppose her candidacy. Although candidates have on occasion been admitted despite the opposition of partners in their home offices, plaintiff's supporters at OGS felt that in view of the strong criticisms her earlier nomination had drawn, she could not possibly become a partner without the unanimous endorsement of her local office partners. Beyer advised plaintiff that it was very unlikely that she would ever be admitted to the partnership. He told her that she could remain at Price Waterhouse as a senior manager, but one of the OGS partners who opposed her candidacy advised her to resign. That advice was consistent with the regular practice and custom at Price Waterhouse, where candidates rejected for partnership routinely left. Hopkins resigned in January 1984 and set up her own consulting firm.

## B. *Proceedings Below*

The District Court had no difficulty finding that plaintiff had presented a prima facie case of sex discrimination: she was a qualified partnership candidate, she was rejected, and Price Waterhouse continued to seek partners with her qualifications. 618 F.Supp. at 1113 (citing *Cooper v. Federal Reserve Bank*, 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984);

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). The court went on to find, however, that Price Waterhouse's consideration of Hopkins', or any other candidate's, interpersonal skills was a legitimate business inquiry, and that plaintiff's management style "provided ample justification for the complaints that formed the basis of the Policy Board's decision." 618 F.Supp. at 1114. The trial judge found that a number of the criticisms leveled at Hopkins because of her treatment of staff were in fact genuine. *Id.* In addition, the trial court concluded that the opposition of the two OGS partners to Hopkins' renomination was likewise based on genuine reservations about her management style rather than any animosity towards her because of her sex. *Id.* Finally, the District Court rejected Hopkins' contention that Price Waterhouse treated her differently than male candidates with abrasive or aggressive personalities. The trial judge concluded that the firm had legitimate, nondiscriminatory business reasons for admitting two such candidates identified by plaintiff, and dismissed evidence she proffered as to the two other male candidates as "fragmentary" and otherwise insufficient proof of disparate treatment.[2] *Id.* at 1115 & n. 6.

The trial court's finding of liability rested instead on its determination that Price Waterhouse had discriminated against Hopkins by filtering her partnership candidacy through a system that gave great weight to negative comments and recommendations, despite evidence that those comments reflected unconscious sexual stereotyping by male evaluators based on outmoded attitudes towards women. *Id.* at 1118–19. The District Court found that comments based on sexual stereotypes were "part of the regular fodder of partnership evaluations," yet Price Waterhouse took no steps to discourage sexism, to heighten the sensi-

tivity of partners to sexist attitudes, or to investigate negative comments to ascertain whether they were the product of such attitudes. *Id.* at 1119. The trial judge acknowledged that it was impossible to measure the precise role sexual stereotyping had played in the Policy Board's decision to deny Hopkins partnership, but found that the decision was in fact tainted by discriminatory evaluations that resulted from the firm's failure to root evident sexism from its evaluation system. Accordingly, the District Court determined that Price Waterhouse bore the burden of demonstrating by clear and convincing evidence that its decision would have been the same regardless of such discrimination—a showing the firm was unable to make.

Having concluded that Hopkins was a victim of sexual discrimination, the trial judge went on to find that she was nevertheless not entitled to an order directing the firm to make her a partner. Applying the doctrine of constructive discharge to the professional partnership setting, the District Court determined that Hopkins' departure from Price Waterhouse was the result of neither intolerable working conditions nor any aggravating circumstances such as a firm history of discrimination or undue humiliation. *Id.* at 1121. Although one OGS partner suggested to plaintiff that she resign, the firm offered to retain her as a senior manager and several partners encouraged her to accept this option. Aside from her failed partnership bid, Hopkins had enjoyed an amicable and otherwise quite successful five years of employment with the firm. The trial court concluded that a discriminatory denial of partnership, without more, did not amount to a showing of constructive discharge and thus did not warrant the equitable relief Hopkins sought. Accordingly, the court denied her both backpay from the date of her resignation and a decree requiring that she

---

**2.** The District Court also rejected Hopkins' evidence concerning the very small number of female partners at Price Waterhouse. The trial court found this evidence "wholly inconclusive" because it failed to indicate the percentage of female partners relative to the percentage of available qualified women, and failed to take

into account the fact that female partners presently at Price Waterhouse were selected over a long span of years during which the pool of qualified women changed dramatically. *Hopkins v. Price Waterhouse*, 618 F.Supp. 1109, 1116 (D.D.C.1985).

be invited to join Price Waterhouse as a partner. The District Court also ruled that although plaintiff had demonstrated her entitlement to an award of backpay compensating her at the partnership salary for the period between her partnership denial and her resignation, she had failed to offer any evidence as to the amount of compensation she should receive. The trial judge acknowledged that this failure was due solely to a stipulation the parties filed in which they agreed to defer resolution of the backpay issue until after the court rendered its liability determination; because that stipulation was filed without the court's knowledge or approval, however, he deemed the issue closed and refused to accept any post-trial evidence on the question. The court therefore awarded Hopkins judgment in the amount of her attorneys' fees only.

The respective cross-appeals followed.

## II.

### A. *The Liability Determination*

Price Waterhouse mounts two attacks on the District Court's determination that it discriminated against Hopkins in violation of Title VII. First, the firm contends that there is no competent evidence supporting the lower court's finding that impermissible sexual stereotyping infected the partnership evaluation system. Second, Price Waterhouse argues that even if this finding is upheld, the liability determination still cannot stand because the lower court expressly found that Hopkins' behavior provided "ample justification" for the complaints about her lack of interpersonal skills, and that these complaints in turn constituted a legitimate, nondiscriminatory business reason for placing Hopkins' candidacy on hold. Thus, the firm submits that even if the evaluation process has not been purged of sexist attitudes, those attitudes were not responsible for the decision to hold Hopkins for further consideration, and therefore Hopkins has failed to establish any causation between the partnership's inappropriate treatment of female candidates and her own unsuccessful candidacy.

### 1. *The District Court's Findings*

As this court recently emphasized, appellate review of District Court findings in Title VII cases is necessarily narrow. *Underwood v. District of Columbia Armory Board*, 816 F.2d 769, 774 (D.C.Cir.1987). In order to overturn a determination of liability, we must conclude that it is " 'based on an utterly implausible account of the evidence.' " *Id.* (quoting *Bishopp v. District of Columbia*, 788 F.2d 781, 786 (D.C.Cir.1986)). Faced with this formidable hurdle, Price Waterhouse eschews any intention of re-arguing its case on appeal: it purports to urge reversal not on the ground that the lower court's view of the evidence is implausible, but on the theory that there simply is no evidence supporting the District Court's finding of discrimination. Notwithstanding its disclaimer, however, defendant's attempt to demonstrate the absence of competent evidence proves, upon closer inspection, to be nothing more than a thinly disguised quarrel with the District Court over appropriate inferences to be drawn from the evidence before it. Given our narrow scope of review, and the reasonableness of the District Court's findings, we must reject that attempt.

In concluding that Price Waterhouse's partnership evaluation system was infected by impermissible, sexually stereotyped attitudes toward women, the District Court relied on three principal pieces of evidence: (1) the comments partners made about Hopkins herself; (2) the testimony of Dr. Susan Fiske, a social psychologist and an expert in the field of stereotyping, who identified some of these comments as the product of sexual stereotyping; and (3) comments made about other women candidates in previous years. Defendant attempts to dismiss this evidence by isolating various comments and arguing that they are either irrelevant, sex-neutral, or otherwise not probative of discrimination. This piecemeal attack on the District Court's finding, however, ignores the fact that we must view the evidence in its entirety, and is in any event unequal to the task of demonstrating that the court's finding is clearly erroneous. *Anderson v. City of*

*Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

Price Waterhouse argues, for example, that the District Court could not have drawn any adverse inferences about the firm's evaluation system from statements describing Hopkins as "macho," "a somewhat masculine hard-nosed mgr," or a manager who "overcompensated for being a woman," because all these comments were made by those favoring her candidacy. That Hopkins' supporters made these statements, however, in no way undermines the District Court's finding that they reflect stereotypical thinking on the part of the commenters. Stereotypical attitudes that sometimes work to the advantage of women, such as the once unchallenged assumption that mothers are inherently superior parents and thus nearly always entitled to custody of children in divorce actions, are no less the product of archaic thinking than those attitudes that disadvantage women. The comments of Hopkins' supporters may or may not have harmed her candidacy,[3] but they are most certainly competent evidence that sexist attitudes were present in the partnership selection process. Price Waterhouse also suggests that one partner's comment that Hopkins needed to take a "course at charm school" is not sex-indicative, because charm is a quality admired both in men and women. This argument borders on the facetious. Charm is indeed an attribute prized in men and women alike, but charm schools are and always have been exclusively female institutions.[4] The sexist import of the comment is patently clear, particularly as charm schools are inextricably linked, both historically and philosophically, with the antiquated notion that women should devote their energies to social and cultural affairs rather than business or professional endeavors. *See* note 4 *supra.*

Perhaps most telling is Price Waterhouse's desperate attempt to erase from the record Thomas Beyer's advice to Hopkins that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 618 F.Supp. at 1117. The firm argues that the District Court erred in stating that Beyer was "responsible for telling her what problems the Policy Board had identified with her candidacy." *Id.* Price Waterhouse claims that this task officially fell to the firm's Senior Partner, Joseph Connor, who made no reference to Hopkins' femininity in his meeting with her following the Policy Board's decision to hold her candidacy. This contention not only rests on the artificial assumption that Beyer, the chief partner in Price Waterhouse's Washington office and Hopkins' leading supporter, would be kept completely in the dark as to the Policy Board's views on her candidacy, but is directly contradicted by the testimony of Roger Marcellin, a member of both the Policy Board and the Admissions Commitee at the time of Hopkins' nomination, who stated that he had "no doubt that Tom Beyer would be the one that would have to talk with her [Hopkins]. He knew exactly where the problems were." Tr. 316. Beyer's advice, of course, speaks for itself.

---

**3.** We do not share Price Waterhouse's emphatic conviction that because the comments in question were made by her supporters, they could not possibly have hurt Hopkins' partnership prospects. Characterizing a female candidate as "macho" and "masculine" is certainly one way of qualifying, and thereby diluting, an endorsement. Supporters of a male candidate are very unlikely to describe that candidate in sexual terms, *i.e.,* as "masculine," or to excuse character flaws as merely the result of "overcompensating for being a man." Indeed, plaintiff's expert, Dr. Fiske, testified that these qualifying statements reflected a conscious effort on the part of the commenters to overcome their stereotypical attitudes and vote for Hopkins despite their disdain for her behavior. Tr. 565. By couching their qualifications in terms of sexual stereotypes, however, these supporters echoed the complaints of Hopkins' critics, thereby lending credence to those complaints and unwittingly undermining the support they sought to provide.

**4.** "Charm school" is a somewhat derogatory colloquialism for an institution formally known as a "finishing school." Webster's defines the latter as "a private school that prepares young women for social life (by emphasizing cultural accomplishments and social graces) rather than for a vocational or professional career." Webster's Third International New Dictionary (1968).

That he ardently supported her candidacy and had every motive to give her what he hoped would be helpful counsel simply underscores the genuineness of his belief that Hopkins' failure to behave in a manner apparently expected of a woman by Price Waterhouse partners had damaged her partnership bid.

The District Court also rested its finding of discriminatory sexual stereotyping on the testimony of Dr. Fiske, an expert in the field of stereotyping, who stated that the disappointed stereotypical expectations of male partners played a "major determining role" in the firm's decision not to make Hopkins a partner. Tr. 545. Disclaiming any intention of denigrating Dr. Fiske's field of expertise, Price Waterhouse attempts to dismiss this evidence as "sheer speculation" of "no evidentiary value." Brief for Appellee-Cross Appellant at 31. This is so, the firm contends, because Dr. Fiske failed to compare the stereotypical comments made about Hopkins with similar comments made about male candidates; she lacked information concerning the authors of these comments; and she had never met Hopkins and had no idea what her conduct or behavior was like. However useful Price Waterhouse might believe this information to be, Dr. Fiske made clear that experts in her field do not require such data in order to determine whether stereotyping is occurring in a given employment context. Dr. Fiske testified that she was an expert at evaluating written comments, that reliance on such written documents was a standard practice in her field, and that she did not need to observe Hopkins or meet her critics because she had the entire universe of reactions to Hopkins before her, as well as comments the same partners made about male candidates. Tr. 595–96. This information, along with other "convergent indicators" of stereotyping—such as the extremely small number of female partners at the firm; the absence of any other female candidates among the 88 nominated along with Hopkins; the exaggerated and extremely intense negative reactions of Hopkins' critics to behavior that supporters perceived as positive; the ambiguous criteria the firm used to evaluate a candidate's personal qualities; the absence of complaints from Hopkins' clients; and the positive assessments of Hopkins in areas where performance could be measured objectively, (*e.g.*, business generation)—taken together provided Dr. Fiske a sufficient basis from which to draw her conclusions that Hopkins was the victim of stereotyping. To the extent that Price Waterhouse believes Dr. Fiske lacked necessary information, the firm is in fact quarreling with her field of expertise and the methodology it employs. Defendant, however, failed to challenge the validity of Dr. Fiske's discipline at trial and disavows any such challenge here. We cannot find any error in the District Court's decision to credit Dr. Fiske's testimony as that of an expert, or the decision to rely on that testimony as evidence of sexual stereotyping at Price Waterhouse.

Finally, the firm challenges the District Court's reliance on comments partners made about other female candidates, contending that the trial judge intentionally misconstrued these statements in order to find in them evidence of stereotypical thinking. One partner stated that he could never vote for a female partner. One successful female candidate was criticized for being a "women's libber," and two other unsuccessful women were characterized as curt, brusque, and abrasive; "Ma Barker"; and "one of the boys." 618 F.Supp. at 1117. It is of course impossible to misconstrue the sentiment behind a categorical opposition to all female partnership candidates. Despite the fact that the firm took no steps to admonish this partner for his statement, which he made just one year before Hopkins came up for consideration, Price Waterhouse suggests the comment is essentially irrelevant because it was obviously ignored by the Policy Board and was "of no further concern ... by the time that plaintiff was proposed." Brief for Appellee-Cross Appellant at 37. The firm also argues that the comment about one candidate being a "women's libber" cannot be viewed as evidence of discrimination because the woman in question became a partner; Price Waterhouse similarly at-

tempts to dismiss the references describing one woman as "Ma Barker" and "one of the boys" as comments utterly devoid of stereotypical attitudes, reflecting nothing more than the author's view that this particular woman was a "hick" who socialized too often with non-professional staff. These arguments miss the mark. The District Court did not purport to find that any of these comments determined the fate of the women in question, reflected the views of the Policy Board itself, or had a direct impact on plaintiff's candidacy. Rather, the court relied on them as evidence that partners at Price Waterhouse often evaluated female candidates in terms of their sex. We find nothing erroneous in such reliance; on the contrary, we believe it is eminently correct.

■ In sum, there is ample support in the record for the District Court's finding that the partnership selection process at Price Waterhouse was impermissibly infected by stereotypical attitudes towards female candidates.

### 2. The District Court's Legal Theory

Price Waterhouse also challenges the liability determination below on two purely legal grounds. First, it contends that Hopkins did not prove "intentional" discrimination on the part of the Policy Board, but only "unconscious" sexual stereotyping by unidentified partners who participated in the selection process. Second, the firm argues that even if such a showing is sufficient to satisfy Title VII's intent requirement, Hopkins did not prove, and the District Court did not find, that this unconscious stereotyping, or the firm's conscious failure to prevent it, actually caused her partnership denial.

■ Hopkins claimed, and the District Court found, that Price Waterhouse treated her differently than the 87 male candidates nominated in 1982 by subjecting her candidacy to an evaluation system that the firm knew or should have known allowed sexual stereotypes to influence decisions on partnership selection. She made a substantial showing of the role such sexual stereotypes played in the selection system gener-

ally and in her own candidacy in particular—a showing made all the more remarkable by the educational background and sophistication of the participants in that system. Price Waterhouse tries to escape liability for this sex-based disparate treatment by arguing that it was not "intentional"—the individual partners who evaluated plaintiff on the basis of stereotypes did so unconsciously, and plaintiff failed to show the extent to which this stereotyping influenced the ultimate decisionmaker in this case, the Policy Board. In so arguing, defendant seeks refuge in the collegial nature of its decisionmaking body, in the subtle and insidious nature of the discrimination involved, and in a mistaken notion of the intent requirement in disparate treatment cases.

As the Supreme Court noted a decade ago in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), disparate treatment is a type of intentional discrimination whereby an "employer simply treats some people less favorably than others *because* of their race, color, religion, sex or national origin. Proof of discriminatory motive is crucial, *although it can in some situations be inferred from the mere fact of differences in treatment.*" *Id.* at 335–36 n. 15, 97 S.Ct. at 1854 n. 15 (emphasis added). Title VII is, of course, remedial rather than punitive in nature. It is designed to remove " 'artificial, arbitrary and unnecessary barriers to employment where those barriers operate invidiously to discriminate on the basis of racial or other impermissible classification.' " *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–01, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). In keeping with this purpose, the Supreme Court has never applied the concept of intent so as to excuse an artificial, gender-based employment barrier simply because the employer involved did not harbor the requisite degree of ill-will towards the person in question. As the evidentiary framework established in *McDonnell Douglas* makes clear, the re-

quirements of discriminatory motive in disparate treatment cases does not function as a "state of mind" element, but as a method of ensuring that only those arbitrary or artificial employment barriers that are related to an employee or applicant's race, sex, religion, or national origin are eliminated.[5] Nor is this surprising, as unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination.[6] Hopkins demonstrated, and the District Court found, that she was treated less favorably than male candidates because of her sex. This is sufficient to establish discriminatory motive; the fact that some or all of the partners at Price Waterhouse may have been unaware of that motivation, even within themselves, neither alters the fact of its existence nor excuses it. *See Lynn v. Regents of the University of California*, 656 F.2d 1337, 1343 n. 5 (9th Cir.1981) ("when plaintiffs establish that decisions regarding ... employment are motivated by discriminatory attitudes relating to race or sex, or are rooted in concepts which reflect such attitudes, however subtly, courts are obligated to afford the relief provided by Title VII"), *cert. denied*, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982).

■ Price Waterhouse nevertheless argues that Hopkins has failed to establish a discriminatory motive on the part of the actual decisionmaker in this case, the Policy Board, because she has not demonstrated the exact impact that stereotyped comments had on the Board's ultimate decision. The faulty logic upon which this contention is premised, however, would, if accepted, place an enormous, perhaps insurmounta-

ble, burden on Title VII litigants who challenge the employment decisions of collegial bodies such as partnerships. It is the rare case indeed in which a group of sophisticated professionals such as the Policy Board would formally pass on the candidacy of a woman or other member of a protected group in the unvarnished terms of the Price Waterhouse partner who objected to all female candidates as a matter of principle. Here, Hopkins presented evidence that stereotypical attitudes towards women had manifested themselves in connection with the partnership bids of other women and, more importantly, that these stereotypes had been brought to bear on her own candidacy. In addition, she offered the expert testimony of Dr. Fiske, who concluded that these attitudes played a "major" role in plaintiff's failure to make partner. In particular, Dr. Fiske noted that these stereotypical attitudes accounted for the extremely negative reactions of Hopkins' critics to behavior that other partners praised in her—negative reactions, moreover, which the Policy Board formally recognized in its recommendation by stating that plaintiff needed to learn social grace. The District Court therefore had ample support for its conclusion that stereotyping played a significant role in blocking plaintiff's admission to the partnership.

■ In *Burdine*, of course, the Court made clear that ultimately the plaintiff bears the burden of persuasion on the issue of intentional discrimination. While the Court noted that this burden requires the plaintiff to prove that "a discriminatory reason more likely motivated the employer," 450 U.S. at 256, 101 S.Ct. at 1095, it

---

**5.** In *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court noted that an employer's erroneous assessment of a protected applicant's qualifications does not, by itself, subject the employer to Title VII liability. Such an assessment is of course an arbitrary employment barrier, but it is not based on the applicant's race, sex, religion, or national origin and is thus not within the scope of the statute. *Id.* at 259, 101 S.Ct. at 1096.

**6.** In *Lynn v. Regents of the University of California*, 656 F.2d 1337 (9th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982),

the Ninth Circuit observed that it was once accepted wisdom that women were unfit to vote, practice law, or undertake professional careers. These beliefs were no less pernicious merely because those subscribing to them may not have suspected their own discriminatory attitudes. Today "[o]ther concepts reflect a discriminatory attitude more subtly; the subtlety does not, however, make the impact less significant or less unlawful. It serves only to make the courts' task of scrutinizing attitudes and motivation, in order to determine the true reason for employment decisions, more exacting." *Id.* at 1343 n. 5.

has never ruled definitively that the plaintiff must establish that impermissible discrimination was the predominant or "but for" motivating factor,[7] and the circuits have divided on the question.[8] *McDonnell Douglas* and *Burdine* set out the analytical framework necessary to establish intentional discrimination when there is no direct evidence of such discrimination and, consistent with this analysis, it is inappropriate to require the defendant, simply on the basis of the inference of discrimination raised by plaintiff's prima facie case, to prove that discrimination was not the but for cause of the challenged employment decision. *See Toney v. Block*, 705 F.2d 1364, 1367–68 (D.C.Cir.1983). Here, however, Hopkins has offered direct evidence that her gender was a significant motivating factor in her failure to make partner, and Price Waterhouse's claim that it had other legitimate reasons for its decision in no way negates her showing. At this point, the utility of the *McDonnell Doug-* *las-Burdine* analysis is at an end, for the question is no longer whether plaintiff was "treat[ed] ... less favorably than others because of ... [her] sex," *Teamsters*, 431 U.S. at 335–36 n. 15, 97 S.Ct. at 1854 n. 15, but rather whether that less favorable treatment in fact caused the adverse decision she challenges.

■ Recognizing that "[d]iscriminatory intent is simply not amenable to calibration," *Personnel Administrator v. Feeney*, 442 U.S. 256, 277, 99 S.Ct. 2282, 2295, 60 L.Ed.2d 870 (1979), courts have struggled to resolve the difficult questions of causation that arise in mixed-motive cases such as this. While most circuits have not confronted the question squarely, the consensus among those that have is that once a Title VII plaintiff has demonstrated by direct evidence that discriminatory animus played a significant or substantial role in the contested employment decision, the

---

7. In *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), the Court stated in a footnote that, for purposes of proving pretext, a Title VII plaintiff need not prove that race was the "sole" basis of the adverse employment action, adding that "no more is required to be shown than that race was a 'but for' cause." *Id.* at 282 n. 10. Significantly, "[t]he 'no more need be shown' phrase indicates that a showing of but for causation would be *sufficient*; it does not signify that such a showing is *necessary* to prevail." *Lewis v. University of Pittsburgh*, 725 F.2d 910, 921 (3d Cir.1983) (Adams, J., dissenting), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984) (emphasis in original). Neither the majority of circuit courts nor the commentators that have addressed the question have viewed the *McDonald* footnote as definitive. *See* note 8 *infra* and Brodin, *The Standard of Causation in the Mixed-Motive Title VII Action: A Social Policy Perspective*, 82 Col.L.Rev. 292, 302 (1982).

More recently, the Court ruled in an analogous setting that for purposes of establishing an unfair labor practice under the National Labor Relations Act, a showing that antiunion bias was a substantial or motivating factor in an adverse employment decision is sufficient to shift to the employer the burden of proving that the decision would have been the same even absent such bias. *National Labor Relations Board v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). The Court noted that in such mixed-motive cases, "[i]t is fair that [the] employer bear the risk that the influence of legal and illegal motives cannot be separated, because he knowingly

created the risk and because the risk was created not by innocent activity but by his own wrongdoing." *Id.* at 403, 103 S.Ct. at 2475.

8. Only two circuits have adopted the "but for" test of causation. *See Lewis v. University of Pittsburgh*, 725 F.2d 910, 915–17 (3d Cir.1983) *and Mack v. Cape Elizabeth School Bd.*, 553 F.2d 720, 722 (1st Cir.1977). Four others have adopted a "substantial factor" test under which race or sex need not be *the* determinative factor, as long as it had a substantial impact on the decision in question. *See Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 712 (6th Cir.1985) (plaintiff must show employer's decision "more likely than not" motivated by impermissible criterion); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875 n. 9 (11th Cir.1985) (plaintiff must show discriminatory motive was "significant or substantial factor" in employment decision); *Fadhl v. City and County of San Francisco*, 741 F.2d 1163, 1166 (9th Cir.1984) (liability may be imposed on finding that sex was a "significant factor"); *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir.1980) (discrimination must be a "significant factor"). The Eighth Circuit has adopted an even less stringent standard that permits a plaintiff to establish Title VII liability simply by showing that an unlawful motive "played *some part* in the employment decision." *Bibbs v. Block*, 778 F.2d 1318, 1323 (8th Cir.1985) (en banc) (emphasis added). This circuit has not yet resolved the question. *See American Federation of Government Employees v. FLRA*, 716 F.2d 47, 51 n. 2 (D.C. Cir.1983).

burden shifts to the employer to show that the decision would have been the same absent discrimination. *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 712 (6th Cir. 1985) (where plaintiff shows by preponderance of evidence that decision more likely than not motivated by impermissible criterion, burden shifts to employer to show decision would have been the same); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 875 n. 9 (11th Cir.1985) (if plaintiff offers direct evidence that discrimination was substantial factor in decision, burden shifts to employer to show decision would have been the same absent discrimination); *see also Bibbs v. Block,* 778 F.2d 1318, 1323–24 (8th Cir. 1985) (en banc) (once plaintiff shows unlawful motive played some part in decision, liability is established; defendant may limit relief by showing decision would have been the same absent discrimination); *Fadhl v. City and County of San Francisco,* 741 F.2d 1163, 1166 (9th Cir.1984) (where plaintiff shows unlawful motive was a significant factor, liability is established; defendant may limit relief by demonstrating decision would have been the same absent discrimination). *But see Lewis v. University of Pittsburgh,* 725 F.2d 910, 915–16 (3d Cir.1983) (plaintiff must show discriminatory animus was the but for cause of decision), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984). We believe that where a Title VII plaintiff has already discharged her burden of demonstrating that the employment decision was based on impermissible bias,

> it is unreasonable and destructive of the purposes of Title VII to require the plaintiff to establish in addition the difficult hypothetical proposition that, had there been no discrimination, the employment

decision would have been made in [her] favor. We chose instead to place the burden upon the employer to show, by "clear and convincing evidence," that the unlawful factor was *not* the determinative one.

*Toney v. Block,* 705 F.2d at 1366 (emphasis in original).[9] This, of course, is precisely the rule the District Court applied below. We believe this burden-shifting mechanism is appropriately invoked in a mixed-motive case such as this, and accordingly we find no error in the District Court's allocation of burdens.

 Finally, Price Waterhouse argues that the District Court's findings conclusively demonstrate that Hopkins' unappealing personality, rather than any unlawful discrimination on the part of the Policy Board, was the but for cause of her failure to make partner. The trial judge expressly noted that the concerns raised over Hopkins' dealings with staff found support in the record and "provided ample justification for the complaints that form the basis of the Policy Board's decision." 618 F.Supp. at 1114. Moreover, the judge acknowledged that because of Hopkins' apparent lack of interpersonal skills, "the Court cannot say that she would have been elected to partnership if the Policy Board's decision had not been tainted by sexually biased evaluations." *Id.* at 1120. Contrary to Price Waterhouse's contentions, however, these statements are not inconsistent with the court's liability determination. On the contrary, they are perfectly in keeping with the fact that this is a case of mixed-motivation. The District Court simply found that both plaintiff's personality and the sexually stereotyped reactions to her personality were significant factors in

---

**9.** In *Toney,* the court declined to apply this test, originally set out in *Day v. Mathews,* 530 F.2d 1083 (D.C.Cir.1976), to an individual claim of disparate treatment. The court noted that the *Day v. Mathews* test was typically applied in disparate impact class actions in which the class plaintiffs prevailed simply by showing generalized discrimination in the employment unit, without demonstrating that each individual class member had actually suffered directly from that discrimination. In *Toney,* the plaintiff, in accordance with *Burdine,* had relied on circumstantial evidence of discrimination "in the air" to prove his prima facie case. As we noted above, in such circumstances it is inappropriate to shift to the employer the burden of proving that discrimination was not the determinative cause of the adverse decision. Here, however, Hopkins has shown by direct evidence not just "background noise" of discrimination, but that "unlawful discrimination had been applied against [her] *in the particular employment decision [at issue]."* *Toney,* 705 F.2d at 1366 (emphasis in original). As we explain above, this crucial finding justifies the burden-shifting rule we apply in this case.

the firm's decision to hold her candidacy. Because Price Waterhouse could not demonstrate by clear and convincing evidence that impermissible bias was not the determinative factor, however, the District Court properly found for Hopkins on the question of liability.

### B. *Relief*

Turning to the question of relief, the District Court found that Hopkins was entitled to recover backpay from the date of her partnership denial until the date of her resignation, but disallowed any such recovery because the parties had attempted to bifurcate the trial and postpone consideration of the issue of damages without the knowledge or consent of the court. With respect to postdesignation damages, the District Court found that Hopkins had failed to demonstrate that she had been constructively discharged and therefore was ineligible both for backpay subsequent to the date of her resignation and an order directing that she be made a partner.

The facts Hopkins proffered in support of her constructive discharge claim are undisputed. She made clear both at trial and during the course of her employment with Price Waterhouse that consideration for partnership was an absolute prerequisite for any job she would take. Indeed, she left Touche Ross when her husband's successful partnership bid eliminated her own chances for partnership, and she threatened to resign in 1981 when Price Waterhouse suggested that her husband's status as a Touche Ross partner might preclude her consideration for partnership at the firm. Nor does defendant take issue in any way with the District Court's finding that following her initial failure to make partner and OGS's decision not to re-propose her, it was "very unlikely" that Hopkins would ever become a partner at Price Waterhouse. It is true that plaintiff could have stayed on at the firm as a senior manager and that at least one partner urged her to do so. On the other hand, the customary and nearly unanimous practice at Price Waterhouse, as at most other accounting firms, is for senior managers who have been passed over for partnership to

resign, and one of the OGS partners who strongly opposed Hopkins' candidacy advised her to do just that.

In ruling that this showing did not suffice to make out a claim of constructive discharge, the District Court relied on *Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir. 1981), where this court stated that in order to prevail on such a claim, an employee must establish that the employer "deliberately made ... working conditions intolerable and drove [the employee] into 'an involuntary quit.'" *Id.* at 1176 (quoting *Retail Store Employees Union Local 880 v. National Labor Relations Board*, 419 F.2d 329, 332 (D.C.Cir.1969)). We agree that, taken at face value, this language sets forth a stringent standard. We believe that the District Court's literal interpretation of that language was misplaced, however, in view of the underlying facts in *Clark*, as well as decisions in cases following it. To begin with, a number of cases, including one relied upon by this court in *Clark*, have rejected the notion that the employer must have the specific intent of forcing the employee to quit. *See, e.g., Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir.1984); *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982); *Bourque v. Powell Electrical Manufacturing Co.*, 617 F.2d 61, 66 (5th Cir.1980). These courts have instead held that it is sufficient if the employer simply tolerates discriminatory working conditions that would drive a reasonable person to resign. In addition, *Clark* and cases subsequent to it reveal that the intolerableness of working conditions is very much a function of the reasonable expectations of the employee, including expectations of promotion or advancement. Thus, in *Clark*, the court noted that the plaintiff, like Hopkins here, "reasonably expected ... opportunities for advancement" and that the employer's actions "essentially locked [her] into a position from which she could apparently obtain no relief." 665 F.2d at 1174. Similarly, in *Parrett v. City of Connersville, Indiana*, 737 F.2d 690 (7th Cir.1984), *cert. denied*, 469 U.S. 1145, 105 S.Ct. 828, 83 L.Ed.2d 820 (1985), the Seventh Circuit

found that plaintiff's transfer, without loss of pay, from chief of detectives to line captain, a dead-end position requiring plaintiff to do virtually nothing, was a form of enforced idleness both humilating and detrimental to a person with the career goals and ambition of the plaintiff. And in *Goss*, the Third Circuit upheld a district court's finding that an employer's discriminatory transfer of plaintiff to a less lucrative sales territory, combined with its indifferent response to her protests of that action, so debilitated and humiliated her that it amounted to a constructive discharge. 747 F.2d 885. In each of these cases there were, of course, other indicia of discriminatory animus, but that is equally true here, where Hopkins faced the prospect of working with a number of partners, including two in her own office, who considered her brusque, abrasive, masculine, and overly aggressive.

 We continue to adhere to the view, first set forth in *Clark*, that the mere fact of discrimination, without more, is insufficient to make out a claim of constructive discharge. Similarly, we believe that discrimination is still best attacked within the context of existing employment relations. Price Waterhouse's decision to deny Hopkins partnership status, however, coupled with the OGS's failure to renominate her, would have been viewed by any reasonable senior manager in her position as a career-ending action. Accordingly, it amounted to a constructive discharge. We believe the District Court erred in ruling otherwise and therefore reverse that portion of its decision and remand the case so that the court may conduct further proceedings in order to determine the appropriate relief.

 In assessing Hopkins' post-resignation damages, the District Court must of necessity consider much if not all of the evidence plaintiff sought to introduce in connection with her claim for backpay for the period between her partnership denial and her resignation. We believe, therefore, that the District Court, in determining damages on remand, should also compensate Hopkins for this period. In so ruling, we do not wish to condone unauthorized bifurcation of Title VII or any other actions, nor are we confident that we would require such a re-determination were it not for our remand. The District Court itself, however, expressly found that Hopkins was entitled to recover pre-resignation damages, and there is no suggestion in the record that she was in any way responsible for the decision to postpone the presentation of evidence in this issue. We are somewhat troubled by the fact that the District Court's penalty for that decision fell solely on plaintiff and resulted in a complete windfall for Price Waterhouse, whose attorneys joined equally in the unauthorized stipulation. In any event, the discourtesy and inconvenience to the court occasioned by the stipulation is largely moot in light of our remand, and we therefore believe it appropriate for the court to award Hopkins the full relief to which she is entitled.

For all the foregoing reasons, we affirm the District Court's liability determination and reverse and remand the case for the determination of appropriate damages and relief.

WILLIAMS, Circuit Judge, dissenting:

The majority implicitly adopts a novel theory of liability under Title VII, but neither confronts the novelty of the theory nor gives it any intelligible bounds. Further, as it must to reach the result, it bends out of recognition this court's holding in *Toney v. Block*, 705 F.2d 1364 (D.C.Cir. 1983). These prodigies are necessary for the outcome because the district court's judgment cannot be sustained under any hitherto accepted notion of Title VII liability.[1]

The theory is one of sexual stereotyping. *See, e.g.*, Majority Opinion ("Maj.") at 465, 468, 469. An analysis grounding Title VII liability in such stereotypes may well be meritorious; but its articulation would require care. No one argues that Congress intended entirely to overturn Justice

---

1. The majority's treatment of the relief issues, however, seems correct.

Douglas's observation that "the two sexes are not fungible." *Ballard v. United States*, 329 U.S. 187, 193, 67 S.Ct. 261, 264, 91 L.Ed. 181 (1946). Dismissal of a male employee because he routinely appeared for work in skirts and dresses would surely reflect a form of sexual stereotyping, but it would not, merely on that account, support Title VII liability. Nor, I suppose, does anyone contend that use of the feminine pronoun "she" to describe a female is a forbidden "evaluat[ion of] female candidates in terms of their sex." Maj. at 468.

The court makes no effort to delineate the theory, to draw a line between permissible and impermissible. There is a good reason not to do so: the record here provided no causal connection between Hopkins's fate and such stereotyping as went on among Price Waterhouse's 662 partners. The evidence of sexual stereotyping [2] is carefully culled from a mass of critical comments on the plaintiff's abrasiveness with no sex link whatever. The district court determined that these comments were well founded in fact, represented standards applied to men and women alike, and were the true basis of the firm's decision. 618 F.Supp. at 1114–16. The questionable remarks consist, with one marginal exception, of two types. First, some of Hopkins's *supporters* used such stereotypes in speaking of her or in voicing their speculations as to the workings of her opponents' minds. Second, other partners had used such terms in *other* years in speaking of *other* female candidates. Thus, though some forms of sexual stereotyping can be discriminatory, the instances here, however they may be characterized, were at most "generalized discrimination within the employment unit," *Toney v. Block*, 705 F.2d at 1367, rather than discrimination *"in the particular employment decision for which retroactive relief was sought,"* *id.* at 1366 (emphasis in original).

Under *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981), and *Toney*, this can do no more than establish a *prima facie* case of discrimination. In functional terms, it put upon the defendant the burden of showing that its stated reasons were not pretextual. Defendant met that burden. The district court made unchallenged findings that the reasons given were "not fabricated as a pretext for discrimination." 618 F.Supp. at 1114. It also found that Price Waterhouse had "legitimate, nondiscriminatory reasons for distinguishing between the plaintiff and the male partners with whom she compares herself." *Id.* at 1115. This clearly restored the burden to plaintiff to show that she was the victim of unlawful discrimination. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The district court's findings that Hopkins's "conduct provided ample justification for the complaints [about her unpleasantness] that formed the basis of the Policy Board's decision," 618 F.Supp. at 1114, clearly shows that plaintiff did not meet that burden.

The district court summarized its view of the evidence of discrimination in these terms:

> Discriminatory stereotyping of females was permitted to play a part. [1] Comments influenced by sex stereotypes were made by partners; [2] the firm's evaluation process gave substantial weight to these comments; and [3] the partnership failed to address the conspicuous problem of stereotyping in partnership evaluations. [4] While these three factors might have been innocent alone, they combined to produce discrimination in the case of this plaintiff.

618 F.Supp. at 1120. I examine these elements in the same order.

1. *Partner comments influenced by stereotypes.* The bulk of the comments instanced as stereotyped are by Hopkins's supporters. One said that opponents focused on Hopkins's profanity "because its [sic] a lady using foul language," another characterized her as "macho," and another

---

**2.** The line between legally permissible and legally impermissible stereotyping has yet to be drawn. When I use the term, I refer simply to whatever expressions have been so characterized by the district court or the majority.

said she had "matured from a tough-talking, somewhat masculine hard-nosed mgr. to an authoritative, formidable, but much more appealing lady partner candidate." *Id.* at 1117. The majority evidently refers to these as "stereotypes ... brought to bear on [Hopkins's] own candidacy," Maj. at 469, but there is no reason to suppose they harmed it.[3] The psychological speculations of Hopkins's boosters cannot by any stretch be "direct evidence that her gender was a significant motivating factor in her failure to make partner." *Id.* at 470.

As for the "smoking gun" remark by her most ardent supporter, Thomas Beyer ("walk more femininely," etc.), there is no reason to suppose that it represented any more than one partner's speculations. The district court was clearly erroneous in characterizing the statement as having been made by Beyer in fulfillment of his "responsib[ility] for telling her what problems the Policy Board had identified with her candidacy." 618 F.Supp. at 1117. Hopkins's own testimony showed that it was Joseph Connor (Beyer's superior) who bore the responsibility for informing Hopkins of the reasons for the decision and who did so. Tr. 87–97. Hopkins testified that Connor made no remarks about her sex. *Id.* at 95. After speaking with Connor she sought Beyer's advice, along with that of several other partners. *Id.* at 98. Beyer had been on vacation, and he made no claim whatever to inside information on the discussions of the Policy Board: he and Hopkins "tried to *guess* who some of the [opposing partners] might be." *Id.* at 89 (emphasis added). Neither her account of that conversation nor any part of her testimony contradicts the natural inference that his advice was just that: personal speculation as to possibly winning strategies. *Id.* at 102. Beyer's testimony confirms this interpretation: Connor had said nothing to Beyer suggesting that Hopkins's dress, walk, or any aspect of her personal appearance was a problem, but Beyer believed such a change might help. *Id.* at 168. He never articulated the basis for the belief.

The majority tries to shore up the misconception by imputing to Price Waterhouse an "artificial assumption that Beyer ... would be kept completely in the dark as to the Policy Board's views on her candidacy." Maj. at 466. No one assumes any such thing. The issue is whether Beyer was summarizing the Policy Board's views or was offering his own helpful suggestions. The evidence of Hopkins and Beyer is clear that it was the latter. The only faint evidence the other way came from Roger Marcellin, a partner in another office who did field work for the Policy Board. Tr. at 305–07. He simply assumed ("ha[d] no doubt") that Beyer would be reporting "where the problems were." *Id.* at 316. Beyer's and Hopkins's testimony on the subject makes clear that Marcellin's guesswork was inaccurate.

In the majority's most dramatic imaginative leap, the stereotyped language of Hopkins's supporters is said, without a shred of supportive evidence, to have "len[t] credence to [stereotyped complaints of Hopkins's critics] and unwittingly undermin[ed] the support they sought to provide." Maj. at 466 n. 3. The creativity of the proposition is underscored by its building in an assumption that stereotyped critiques by Hopkins's opponents exist—an assumption for which the majority identifies no record support.

The only remark by a Hopkins opponent that can be characterized as manifesting sexual stereotyping is the facetious suggestion that she should take a "course at charm school." The smoke from this gun seems to me rather wispy. It was embedded in the following comment:

> Contacts with Ann are only casual—several mtgs at OGS and MMGS sessions. However, she is consistently annoying and irritating—believes she knows more than anyone about anything, is not afraid to let the world know it. Suggest a course at charm school before she is con-

**3.** *Cf.* Maj. at 466 ("The comments of Hopkins' supporters may or may not have harmed her candidacy....")

476

sidered for admission. I would be embarrassed to introduce her as a ptnr. Def.Exh. 27.

The substance of the remark has nothing to do with sex stereotypes. It fits with the many other characterizations of Hopkins ("too assertive, overly critical of others, impatient with her staff"; it required "diplomacy, patience and guts to work with her"; 618 F.Supp. at 1114) for which, the district court found, plaintiff's "conduct provided ample justification," *id.* The objection, of course, is to the opponent's silly phrase. The reference was doubtless sex-linked, and the majority is not unfair in characterizing it as a "somewhat derogatory colloquialism." Maj. at 466 n. 4. Thus it may be more "sexist" than a comment, such as might be made of a young man, wanting in character, that he ought to be "sent to military school." But to find discrimination by Price Waterhouse based simply on this remark is "utterly implausible." *See Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C.Cir.1986) (discussing criteria for disregarding district courts' findings of fact in Title VII cases).

The district court and the majority take refuge in comments made by Price Waterhouse partners in evaluations of other women in other years. 618 F.Supp. at 1117; Maj. at 467–68. These included one plainly beyond the pale—a remark by a partner that he "could not consider any woman seriously as a partnership candidate and believed that women were not even capable of functioning as senior managers." 618 F.Supp. at 1117. So we know that, at least at some time in the past, there was one male chauvinist pig rampant among the Price Waterhouse partners. But there is no evidence that this troglodyte ever influenced a single other partner. His comment was not repeated after 1981, perhaps because the informal atmosphere in the firm made such remarks unacceptable. In any event, no one claims he played any role in the relevant evaluation.

The other remarks (still relating to other evaluations in other years) are ambiguous. For instance, it had been said of one woman candidate that she acted too much like "one of the boys," 618 F.Supp. at 1117, but this was apparently a criticism of her for socializing too much with the clerical staff and not enough with the professionals. Def.Exh. 64, tab 22. Even the majority recognizes that these remarks had no "direct impact on plaintiff's candidacy." Maj. at 468. But it takes them as evidence that partners at Price Waterhouse "often evaluate female candidates in terms of their sex." *Id.*

In a case where alleged sexual stereotyping had a demonstrable connection to the plaintiff, a careful analysis of such remarks would be in order. Such an analysis would begin with the recognition that not all sex-based phrases are sexist. Our vocabulary is full of such phrases, some of which have gradually detached themselves from any genuine link to sex, or even switched sex. Thus "doll," originally a slang phrase for a "conventionally pretty and shapely young woman, ... whose function is to elevate the status of a male and to inspire general lust," *see* NEW DICTIONARY OF AMERICAN SLANG 108 (R. Chapman ed. 1986), has come in some contexts to refer to any "notably decent, pleasant, generous person," as in "Isn't he a doll?" That is the way language evolves, especially in a lively, spontaneous culture such as ours. Words themselves are metaphors, and it is in their nature to acquire meanings completely detached from original, concrete detail, whether or not sex related. Thus the phrase "BS" clearly relies on no distinction between cows and bulls.

Here, the phrase "one of the boys" was used in a sex-neutral sense: it was used of a woman, and since it evidently referred to her camaraderie with clerical staff at Price Waterhouse, the statistical probability is overwhelming that they were predominantly women. The phrase's connotation of easy familiarity (an "ordinary, amiable man ... without side or lofty dignity; = ORDINARY JOE: *His Eminence was trying to be one of the boys,*" *id.* at 305) easily escapes its masculine origins. The phrase does not manifest sexism, notwithstanding the solemn avowals of the plaintiff, the district court and the majority.

But this case does necessitate a study of just what expressions Congress may have wished to wash from the American tongue. The remark related to another candidate in another year. It plainly was not "direct evidence that [Hopkins's] gender was a significant motivating factor in her failure to make partner." Maj. at 470.

In discussing sex stereotyping, the district court gave great weight to the testimony of Dr. Susan Fiske, a witness purporting to be an expert in that field. She claimed to be able to find forbidden stereotyping simply by reading partners' comments—without information about the truth of the matters commented upon. Of course where the remarks themselves carry such a tint (if, for example, a commenter had said, "She's too masculine"), anyone could do so. But (apart from the "charm school" remark) no Hopkins detractor said any such thing. Dr. Fiske's expertise rose to the occasion. Her arts enabled her to detect sex stereotyping based largely on "the intensity of the negative reaction." Tr. at 559. So if an observer characterized someone as "overbearing and arrogant and abrasive and running over people," an expert such as Dr. Fiske could discern—and would, if the subject were a woman—that they stemmed from unconscious stereotypes. Dr. Fiske could do this without meeting the subject of the comment or making any inquiry into a possible factual basis. *Id.* at 569, 595–97. To an expert of Dr. Fiske's qualifications, it seems plain that no woman could *be* overbearing, arrogant or abrasive: any observations to that effect would necessarily be discounted as the product of stereotyping. If analysis like this is to prevail in federal courts, no employer can base any adverse action as to a woman on such attributes.

2. *The evaluation process gave weight to such comments.* This generalization suffers precisely the defect of the first leg of the tripod of liability: it depends entirely upon comments that could not have adversely affected Hopkins. Either they re-

lated to other candidacies in other years, or they represented her supporters' views or intuitions about her adversaries. All we have that connects in any potentially adverse way with Hopkins is the "charm school" remark.[4]

3. *Neglect of duty to address problem of stereotyping.* Key to the district court's finding of liability was Price Waterhouse's failure to institute special programs for sensitizing partners to sex stereotyping, or otherwise to stamp it out of the evaluation process. 618 F.Supp. at 1120. This breaks new ground, blithely free of any effort to link it to any established legal principles. Nor is the new theory intelligibly defined. What set of facts triggers the duty? If such an omission is to ground liability, perhaps the plaintiff should bear an initial burden of demonstrating that gender stereotyping was more probably than not the cause of the adverse employment decision. The majority, like the district court, fails to clarify this important issue, perhaps because it is so clear that Hopkins failed to make such a showing.

From the facts here, it looks as though the duty to sensitize has a hair trigger. The implications are serious. The more delicate the trigger, the more completely this court has dropped the requirement of intentional discrimination out of the law. As few employers can say with confidence that those who run its hiring and promotion are one hundred percent free of what may later be characterized as forbidden stereotyping, the only safe course will be to institute programs of the sort approved by the district court. The rule turns Title VII from a prohibition of discriminatory conduct into an engine for rooting out sexist thoughts.

4. *Innocent alone, the three factors combined to produce discrimination in the case of this plaintiff.* Such alchemy is mysterious. Having found that specific complaints caused the Policy Board's adverse decision and that there was ample

---

**4.** If this leg is in any way based on the firm's procedure of giving substantial weight to "no" votes, it is inconsistent with the district court's prior finding that "the firm's practice of giving 'no' votes great weight treated male and female candidates in the same way." 618 F.Supp. at 1116. *See Mitchell v. Baldrige,* 759 F.2d 80, 85 n. 3 (D.C. Cir.1985).

justification for the complaints, the district court took up the allegations of stereotyping floating in the Price Waterhouse ether and the remarkable intuitions of Dr. Fiske. 618 F.Supp. at 1117–20. The court began on a cautious note—some negative comments on Hopkins *"might be* attributed to sex stereotyping." *Id.* at 1118. It next determined that the commenters *"may have been* influenced by a sex bias." *Id.* It then progressed from "might" to "did," but never revealed how it reached the final *ipse dixit.*

The evidence here establishes at most the existence of sexist attitudes. Thus there can be no doubt that this court's decision in *Toney v. Block* controls. The showing of "generalized discrimination" can at the most establish a *prima facie* case, requiring defendant to meet its burden of showing non-pretextual grounds for its action. The district court properly found those established, restoring the burden to plaintiff.

The majority would eviscerate *Toney* by a clever name change: calling the case one of mixed motive, the majority looks to precedents in related areas where a party acting with one permissible motive and one unlawful one may prevail only by affirmatively proving that it would have acted as it did even if the forbidden motive were absent. I have no quarrel with this principle. *See National Labor Relations Board v. Transportation Management Corp.,* 462 U.S. 393, 403, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). But it has no relevance where, as here, discrimination has *"not* been specifically attributed to the employment decision of which the plaintiff complains." *Toney,* 705 F.2d at 1366. *Toney* does not permit a plaintiff to invoke the "mixed motive" concept whenever (1) he or she has shown only background evidence of some generalized discrimination and (2) defendant has proven that a non-pretextual reason "formed the basis" of the act. If this court is to deep-six *Toney,* it should do so *en banc.*

There is not enough evidence of intentional discrimination to support a verdict for Hopkins under any established approach to Title VII liability. The stereotype theory adopted by the district court should not be allowed to spring to life in a case where its occurrence is not plausibly related to the decision on plaintiff. If a court is to develop such a theory, it should do so in a context where it and the parties properly focus on what elements of sexual differentiation Congress may have sought to stamp out. If failure to provide sensitivity training is to be a ground of Title VII liability, there should be some illumination of the circumstances triggering the duty. And if *Toney* is to be overturned, it should not be by a panel of this court. I dissent.