**Teresa M. CONTARDO, Plaintiff,**

**v.**

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.**

**Civ. A. No. 86–1081–S.**

United States District Court,
D. Massachusetts.

Dec. 14, 1990.

Nancy Gertner, Silverglate, Gertner, Fine Good & Mizner, Boston, Mass., for plaintiff.

Bryan G. Killian, Phyllis Fine Menken, Sherin and Lodgen, Boston, Mass., for defendant.

## FINDINGS OF FACT, RULINGS OF LAW AND ORDER FOR JUDGMENT

SKINNER, District Judge.

In this action the plaintiff seeks damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f), and the Massachusetts Civil Rights Act, M.G.L. c. 151B, for alleged disparate treatment while in the employment of the defendant, based upon her sex.[1] The action was tried without jury.

The plaintiff alleges that she was constructively discharged from her position as a broker because of sex discrimination which created intolerable conditions of employment, leading her to resign her position in August, 1984. She has offered direct evidence of the existence of a male oriented atmosphere, but with respect to the events which precipitated her resignation, she relies on circumstantial evidence.

■ At the outset, the plaintiff must make out a *prima facie* case of intentional discrimination. Her *prima facie* case may be established by inference in a discriminatory treatment case as well as in a discriminatory impact case. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Denial of opportunities for promotion and advancement by reason of sex discrimination may constitute intolerable conditions of employment justifying an employee's resignation, and warranting a finding of constructive discharge. *Hopkins v. Price Waterhouse*, 825 F.2d 458 (D.C.Cir.1987), (*"Hopkins I"*) rev'd on other grounds, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *after remand "Hopkins II,"* 920 F.2d 967 (D.C. Cir.1990). "The burden of proving a *prima facie* case is 'not onerous' ... [citation]." *Watson, supra,* 487 U.S. at 986, 108 S.Ct. at 2784. With respect to this case, it would appear that the plaintiff's *prima facie* case is established by evidence that she is a member of a protected class, that she was qualified to participate in the employment opportunities offered by her employer, that the same opportunities were offered to others, not in the protected class, who were no more qualified than she, and that her deprivation was the result of intentional discrimination or its functional equivalent. *Watson, supra,* 487 U.S. at 987, 108 S.Ct. at 2785. See *McDonnell*

---

1. In the plaintiff's brief, the writer says, "Like the Dickens novel this is a story of two offices —," presumably a reference to *A Tale of Two Cities.* I suggest that a better Dickensian reference, at least as to title, would be *Great Expectations,* or from the plaintiff's point of view, *Bleak House.*

*Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Court has held that not only may disparate impact analysis be utilized in disparate treatment cases, but that "subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases." *Watson, supra*, 487 U.S. at 991, 108 S.Ct. at 2787. The plaintiff must identify the particular employment practice which she alleges has discriminatory effect, and establish a causal connection to the alleged disparate treatment. *Id.*, 487 U.S. at 994, 108 S.Ct. at 2788.

If the plaintiff's *prima facie* case be established by disparate treatment analysis, that is, by inference from the observed consequences of the offending employment practice, then the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory business reason for its conduct. The plaintiff, however, retains the ultimate burden of proof, which may be satisfied by evidence that the defendant's asserted reason is probably a mere pretext. If the plaintiff's *prima facie* case be supported by direct evidence of sex discrimination, however, the defendant has the burden of proving by a preponderance of the evidence, as an affirmative defense, that the same employment decision would have been made for a neutral reason in the absence of the discriminatory motive. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). It is, of course, always open to the defendant to contest the reliability of the evidence supporting the plaintiff's *prima facie* case.

■ Sex discrimination has cast a shadow on the plaintiff's relationship with the defendant from the very outset. When she applied for a position as a broker in 1972, the defendant employed no women above the secretarial and staff assistant level. The plaintiff's application for a position as a broker (or "account executive" in the defendant's parlance) was rejected. Only after she successfully prosecuted a sex discrimination complaint before the Massachusetts Commission Against Discrimination was she employed by the defendant as a stockbroker. Even the employment examination was clearly designed to be answered by men. During the early part of her service with the defendant, she was subjected to varying forms of sexual harassment, including the placing of male pornographic pictures in her desk, and repeated sexual innuendoes and improper touching at office gatherings, such as Christmas parties. There existed in the office a male "locker room" atmosphere in which the male brokers engaged in lewd remarks and male birthdays were celebrated in the office, in the presence of customers, with, for instance, a birthday cake in the shape of a phallus, and on other occasions by the presence of "exotic" female dancers. She never complained to the management about this conduct.

The plaintiff was also excluded from various company outings to which male brokers were invited and at which important information was exchanged. She was not informed that the defendant had tickets to various sporting events which it made available to its male brokers to offer to favored customers.

Despite these conditions the plaintiff persevered. She worked very hard and became one of the top producers in the defendant's Boston office. The defendant ranked the performance of its brokers nation-wide by assigning them to various "clubs." The plaintiff was assigned to the Win Smith Club, the second highest category in the defendant's national organization. Her efforts were recognized to a considerable degree. She was given favorable office space, an honor reserved for major producers. She received a very complimentary review from the office manager when she was considering taking a management position. She was offered the management position, but declined it, because she would have to relinquish her "book," her list of regular customers, and forego the opportunity to develop a larger income through commissions. She was given two positions of responsibility, coordinator of the defendant's insurance program and coordinator of the defendant's Cash Management Account program. Both insurance and cash

management accounts were important new products for the defendant, particularly the cash management program, which permitted the defendant to process virtually all of a customer's financial affairs for a fee. The defendant claims to have invented this product. In each case, the plaintiff was responsible for educating the other brokers about the programs and encouraging the promotion of these programs in the Boston office. She received no compensation for these extra efforts, a circumstance which she identifies as one of the discriminatory acts which rendered her employment intolerable.

There were three areas in which the plaintiff claims that she was denied an equal opportunity to make money because of sex discrimination:

1. Participation in the private placement of tax-sheltered limited partnership shares in real estate;

2. Participation in the division of the "book" of retiring or departing brokers; and

3. Compensation for her efforts in coordinating two important sales programs.

Tax-sheltered investments were in great demand prior to the Tax Reform Act of 1986. A broker who was able to direct a customer into such an investment garnered favor with the customer as well as earning a substantial commission. The opportunities for such placement were severely restricted, and the defendant's Boston office was assigned only a limited number. Under the applicable governmental rules, investors in these partnerships were required to qualify for the opportunity by showing that they were experienced and informed investors with adequate financial resources to absorb the risks involved. Brokers were given the opportunity to submit Offeree Qualification Wires (OQW's) to the New York office on behalf of their customers. The customer's qualification would be determined by the New York office. If there were more qualified customers than there were investment opportunities, the investments would be allocated among the brokers in the Boston office by the local coordinator, a broker by the name of Hanlon.

Theoretically, all of the brokers were supposed to be notified of the availability of these units and given a chance to submit as many OQW's as they wished. The plaintiff claims that in fact the availability of these investments was not widely advertised, but funneled by Hanlon to particularly favored brokers, all of whom were men. Hanlon admitted in testimony that he encouraged certain brokers to submit OQW's because he thought their customers were likely to qualify and were likely to actually purchase these units. He testified that he did not consider the plaintiff to be a broker who was likely to close sales of these units, because on one occasion she had asked him to make the presentation for her.

There was evidence of twelve real estate placements processed through the Boston office from 1980 through 1984. Twenty-nine brokers submitted a total of 185 OQW's, resulting in the sale of 68 units. Four brokers, Hanlon, Reilly, Knouse and Martineau, accounted for 106 OQW's and 50 sales. Hanlon and Reilly alone accounted for 57 OQW's and 36 sales. The plaintiff submitted six OQW's, resulting in three sales. The only other female broker to participate in this program was Mary Calhoun, who submitted one OQW, which did not result in a sale. The 23 other equally disadvantaged brokers were men, a few of whom had production records that were as good as the plaintiff's.

Distribution of the accounts of brokers who left or retired from the defendant's Boston office was handled on a very informal basis. The departing broker's choice of a person to handle particular accounts, the preference of the customer and management's attempts to match the customer to a particular broker were the key factors in the reassignment of accounts, according to the defendant. Only six actual records of account reassignment have been found. In each of these cases the best producing accounts went to men. In four of these cases the plaintiff received but a few low paying accounts, which she describes with some justice as "crumbs from the table." The two accounts in which she secured a better share were of two departing female brokers, and even

then the top producing accounts went to men. The defendant says that in the case of Paul Dussosoit, his accounts had to be reassigned to another expert in commodities trading, which is a specialty. This may explain why the best accounts all went to one broker, but does not explain why other substantial accounts went to men who were not specialists, such as Baumann, while only two small accounts went to the plaintiff, and none to any other woman. Only two other women received any reassignments: Amy Botto received six very small accounts from Baumann and Mary Calhoun received three small accounts from Bain.

The defendant says that (1) this is an insubstantial sample upon which to base a statistical conclusion, (2) there was no deliberate discrimination, and (3) things just happened that way. The defendant also points out, correctly, that some of the men did not do well in receiving reassignments. It is also true that men of the plaintiff's experience and production record in general did better than she did, and neither the plaintiff nor any other woman received any substantial accounts as a result of the reassignment process revealed by the six extant accounts. While there were doubtless many other departures in this highly mobile industry, for which there are no extant records, the plaintiff testified that she never received substantial accounts as part of the reassignment process, and there is no reason to disbelieve her.

There were no criteria or standards promulgated by the defendant to determine when project coordinators received additional compensation. The award was apparently totally discretionary, not to say whimsical. Several men received extra production credits, which translated into extra income; several men did not. Hanlon received $258,000 of extra production credits for his work as tax shelter coordinator, thus increasing his standing as well as substantially increasing his income. The defendant says that this award resulted from Hanlon's work for the whole New England region, but there is evidence that his duties were no more onerous than were the plaintiff's with respect to her programs. In any case, no woman serving as a coordinator was ever awarded extra credits, or extra benefits in any form, for her efforts.

In *Watson v. Fort Worth Bank & Trust, supra,* 487 U.S. at 990–1, 108 S.Ct. at 2786–87, there appears the following statement, in which all of the Justices concurred:

If an employer's undisciplined system of subjective decisionmaking has

precisely the same effect as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply. In both circumstances, the employer's practices may be said to "adversely affect [an individual's] status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2). We conclude, accordingly, that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases.

This is just such an appropriate case. While the evidence adduced by the plaintiff admittedly does not furnish a quantum of data to support a true statistical analysis, there is, in my opinion, sufficient circumstantial evidence to warrant a finding that the plaintiff was the victim of sex discrimination in the course of her employment by the defendant.

One would expect that in a course of sex-neutral decision making, the plaintiff would have been accorded favorable treatment in at least one of the areas outlined above, given her seniority, proven capacity and devotion to the work of the office. The fact that the defendant's "undisciplined system of subjective decisionmaking" led always to favor the men over the women, against a background of overt insensitivity and actual harassment in the past, "suggest[s] a lingering form of the problem that Title VII was enacted to combat." *Watson, supra,* 487 U.S. at 990, 108 S.Ct. at 2786. Accordingly, I find and rule that the plaintiff has established a *prima facie* case of sex discrimination in employment.

The burden thus shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the disparate treatment of the plaintiff. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *Watson, supra*, 487 U.S. at 986, 108 S.Ct. at 2784. The defendant's proffered evidence has been described above, and does not even purport to deny the overtly male-dominated mores of the office, and as to the three areas of which the plaintiff complains, it offers only discretionary judgments uninformed by any established criteria or policy. "Obviously, in cases ... in which the legitimate reason articulated by the employer was of such a subjective nature as to itself invite stereotyping, the employer bears the additional burden of showing that the stereotyped attitudes did not so pervade the subjective evaluation as to destroy the articulated reason's legitimacy." *Hopkins II, supra*, 920 F.2d at 973. I have serious doubt that the defendant's evidence even satisfies its burden of production. In any case, I find and rule that the plaintiff has satisfied her burden of proving by a preponderance of the evidence that the defendant's asserted justification for disparate treatment, i.e., the exercise of sound discretion, is a pretext for sex discrimination in the form of pervasive indifference to and denial of the right of female employees to enjoy equal opportunities with their male counterparts. Accordingly, I find as a fact that the plaintiff had been subjected to sex discrimination in employment by the defendant up to the time that she resigned her position.

That is not to say, however, that she suffered a constructive discharge. "[T]he mere fact of discrimination, without more, is insufficient to make out a claim of constructive discharge." *Hopkins I, supra*, 825 F.2d at 473. The "more" in *Hopkins I* was an employment decision which "would have been viewed as a career-ending action." *Id.* Other cases in which constructive discharge has been found evidenced demotion, humiliating and unjustified criticism or additional work loads. *E.g., Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559 (1st Cir.1986). I do not find any of these additional factors to be present in this case. The defendant obviously did not want the plaintiff to leave, and at least by 1984 she was not being harassed or otherwise abused. The defendant's failure to afford her an equal shot at some lucrative business, while in my view a violation of Title VII and M.G.L. c. 151B, was not career-ending. She was, in fact, enjoying a rather successful career, with the likelihood, by her own account, that it would become more successful in time.

The discrimination which I find to have occurred was relatively covert, and habitual, even mindless, rather than pre-meditated, though no less detrimental from the plaintiff's point of view, or illegal from this court's point of view, than overt discrimination might have been. In my opinion the facts adduced in this case do not warrant a finding of constructive discharge. *Cf., Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir.1977).

Unfortunately for the plaintiff, the present state of the record does not warrant the granting of any of the relief which she seeks under Title VII. She does not seek reinstatement, and she has introduced no evidence of the differential between what she actually earned as an employee of the defendant and what she would have earned in the absence of discrimination, which might be construed as back pay. The only damage evidence relates to wrongful discharge. Compensatory and punitive damages may not be recovered under Title VII, which provides for equitable remedies only. Accordingly, I find for the defendant on the plaintiff's claims under Title VII.

A different set of rules governs the plaintiff's claim under M.G.L. c. 151B, however. Section 9 of that chapter provides for compensatory damages, including "front pay." *Conway v. Electro Switch Corp.*, 402 Mass. 385, 523 N.E.2d 255 (1988). By St.1989, c. 722, § 31, section 9 was amended by adding a provision for punitive damages. The traditional method of interpreting statutory amendments is to apply substantive changes prospectively

only, but to apply remedial and procedural changes retroactively. See *Ellis v. Ford Motor Company*, 628 F.Supp. 849, 852 (D.Mass.1986), citing *In re Beausoleil's Case*, 321 Mass. 344, 73 N.E.2d 461 (1947). I conclude that the provision for punitive damages applies to this case.

▮ The statute provides no criteria for the application of punitive damages other than the admonition that "this chapter shall be construed liberally for the accomplishment of the purposes thereof." M.G.L. c. 151B, § 9. This is in contrast to the rare other provisions for punitive damages in Massachusetts law, which generally provide that punitive damages are to apply only to a defendant's willful, malicious or wanton and reckless conduct. *E.g.*, M.G.L., c. 229, § 2; c. 93A, § 11. I conclude, in the absence of any indication to the contrary, that punitive damages may be employed to accomplish the purposes of the statute. "The general rule that punitive damages may not be awarded unless the party seeking them has sustained actual damage is accepted universally ..." by the states. Tinney, *Sufficiency of Showing of Actual Damages to Support Award of Punitive Damages—Modern Cases*, 40 ALR 4th 11, 18. A majority of state courts which have considered the question, however, have held that nominal damages fulfill the requirement of actual damages. *Id.* at 36–40. The Massachusetts courts have not addressed the issue, either under this statute or in any other context.[2]

For the reasons stated above I can not find actual damages on this record. The plaintiff has asserted a claim for mental and emotional distress. In my opinion such damages are probably recoverable under M.G.L. c. 151B, § 9, if proved. The testimony of plaintiff's expert was equivocal on the issue of the cause of her condition, however, and I do not find the causal connection to have been established by a preponderance of the evidence.

I do find that the plaintiff is entitled to nominal damages in the amount of $1.00 and punitive damages in the amount of $250,000. In my opinion, the purposes of the statute will be served by the deterrent effect of this award, by deterring what I believe to be endemic and habitual discrimination against women by undisciplined discretionary decisions in workplaces dominated by men. The plaintiff is also entitled to her reasonable attorney's fees under c. 151B, § 9, and to interest calculated in accordance with the Massachusetts rule.

A judgment in accordance with the foregoing shall enter forthwith.

---

**2.** By analogy, a number of federal courts have awarded punitive damages even in the absence of actual damages in cases brought under 42 U.S.C. § 1983. *Endicott v. Huddleston*, 644 F.2d 1208, 1217 (7th Cir.1980). *See also Basista v. Weir*, 340 F.2d 74, 88 (3rd Cir.1965); *Harrison v. United Transportation Union*, 530 F.2d 558, 563 (4th Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976); *McCulloch v. Glasgow*, 620 F.2d 47, 51 (5th Cir.1980); *Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir.1976); *Spence v. Staras*, 507 F.2d 554, 558 (7th Cir. 1974); *Gill v. Manuel*, 488 F.2d 799, 802 (9th Cir.1973); *Stolberg v. Members of Board of Trustees for the State Colleges of Connecticut*, 474 F.2d 485, 490 (2nd Cir.1973).